2005 ME 5

**STATE of Maine**

v.

**Thomas C. REGA.**

Supreme Judicial Court of Maine.

Argued: Sept. 21, 2004.
Decided: Jan. 10, 2005.

Stephanie Anderson, District Attorney, Julia A. Sheridan, Asst. Dist. Atty. (orally), Portland, for State.

Mary A. Davis, Esq. (orally), Tisdale & Davis, P.A., Portland, for defendant.

Panel: SAUFLEY, C.J., and CLIFFORD, RUDMAN, DANA, ALEXANDER, CALKINS, and LEVY, JJ.

CALKINS, J.

[¶ 1] Thomas C. Rega appeals from the judgment entered in the Superior Court (Cumberland County, *Cole, J.*) after a jury trial convicting him of kidnapping, 17–A M.R.S.A. § 301(1)(A)(3) (Class A) (1983),[1] and gross sexual assault, 17–A M.R.S.A. § 253(1)(A) (Class A) (Supp.2001).[2] Rega contends that the trial court erroneously admitted out-of-court statements Rega's wife made to the police and another witness, and he argues that the evidence was insufficient to support the convictions. Rega also challenges the admission of expert testimony concerning his mental state. We affirm the judgment.

## I. BACKGROUND

[¶ 2] Rega's convictions arose from events on July 28, 2002, at the Freeport home he shared with his wife and their daughter. The previous night, the wife had stayed at her mother's home in Massachusetts where she received telephone calls from Rega threatening to kill her and her family. The wife called the Freeport police on the morning of July 28 and asked that Rega be arrested. The police told the wife to come to the police station and make a report. The wife drove to Maine, dropped her daughter off at a friend's house, and after checking to make certain that Rega was not at their Freeport house, she went there to pick up a few items.

[¶ 3] Rega arrived while the wife was in the yard of their home. He took her by the arm and into the house. The wife had turned on an audio recording device before Rega arrived and some of their conversation was recorded. In the house, Rega became enraged and accused his wife of cheating with another man and conspiring with police to ruin his life. On the recording, the wife told Rega to put down the knife, and he can be heard screaming and threatening to kill the wife and her family. Rega told the wife that she was his hostage, and she did not think that she could leave.

[¶ 4] The wife performed oral sex on Rega while he instructed her on what to do. Rega had tied her hands and one foot, but in the bathroom she untied herself. She dove out a window and, partially undressed, got to her car. She drove down a dead-end road and ran into a nearby flow-

---

1. The version of section 301 in effect on July 28, 2002, when the events in this case took place, reads, in part:

 1. A person is guilty of kidnapping if either:
 A. He knowingly restrains another person with the intent to
 . . . .
 (3) inflict bodily injury upon him or subject him to conduct defined as criminal in chapter 11 [sex offenses].
 17–A M.R.S.A. § 301 (1983), amended by P.L 2001, ch. 383, § 26 (effective Jan. 31, 2003) (current version at 17–A M.R.S.A. § 301 (1983 & Supp.2004)).

2. The version of section 253(1)(A) in effect on July 28, 2002, reads, in part:

 1. A person is guilty of gross sexual assault if that person engages in a sexual act with another person and:

 A. The other person submits as a result of compulsion, as defined in section 251, subsection 1, paragraph E[.]
 17–A M.R.S.A. § 253(1)(A) (Supp.2001), amended by P.L 2001 ch. 383, §§ 14–20 (effective Jan. 31, 2003) (current version at 17–A M.R.S.A. § 253 (1983 & Supp.2004)).
 According to section 251(1)(E),
 "Compulsion" means the use of physical force, a threat to use physical force or a combination thereof that makes a person unable to physically repel the actor or produces in that person a reasonable fear that death, serious bodily injury or kidnapping might be imminently inflicted upon that person or another human being.
 "Compulsion" as defined in this paragraph places no duty upon the victim to resist the actor.
 17–A M.R.S.A. § 251(1)(E) (Supp.2004).

er shop. The entire incident at the house lasted approximately two hours.

[¶ 5] In the flower shop, the wife blurted to the shop owner, "I've been held hostage, lock the doors, he'll kill us both." She was bleeding and said that she had been stabbed. The owner gave her his shirt, sent her to the cellar, locked the door, and called 911. The wife huddled under a tarp until the police arrived, about five to eight minutes later. A police officer reassured her that she was safe, and she came out from under the tarp. She was crying, shaking, bleeding, and inconsolable. A police officer asked her what had happened, and he recorded their conversation. Another officer was also present and asked her questions as well.

[¶ 6] The wife told police that Rega had been holding her hostage and had threatened to slit her throat. In response to a police question concerning the location of her daughter, she said her daughter was at a friend's house in Westbrook. The wife then told police how she had escaped from Rega. The police asked how she got a cut on her head, and she said it came from the knife Rega held. She said that Rega made her perform sexual acts while he held a knife to her head and threatened to put the knife through her brain. She then told police that she was worried about her daughter, and, in response to questions from the police, she described her husband's vehicles and provided a better description of her daughter's location. After more discussion about her escape, the wife said that Rega cut her with a knife, held the knife to her throat, and told her that he was holding her hostage. She again said that Rega sexually assaulted her and stated "he made [her] perform oral sex with a knife to [her] head."

[¶ 7] Rega was indicted and tried on several offenses, including kidnapping and gross sexual assault.[3] At trial, the wife testified as did the shop owner and the two police officers who had interviewed the wife after the incident. The audio recording of the incident at the house was admitted in evidence.

[¶ 8] The recording made by the police of the interview with the wife at the flower shop was the subject of a pretrial ruling. Rega objected to the entire recording on the ground that it was hearsay. The State argued that the entire recording, approximately twenty-three minutes in length, was admissible as an excited utterance, pursuant to M.R. Evid. 803(2). The court ruled that the first portion of the recording would be admitted as an excited utterance, but it was inadmissible from the point that the wife answered questions about the location of her daughter. At that point she became calm, and her statements thereafter were not the result of the stress of excitement.

[¶ 9] During the direct examination of one of the police officers, the prosecutor asked the officer if he remembered the point in the interview with the wife when

3. In addition to the kidnapping and gross sexual assault charges that are the subject of this appeal, the indictment also charged Rega with criminal threatening with a dangerous weapon, 17–A M.R.S.A. § 209 (Class B) (1983); assault, 17–A M.R.S.A. § 207(1) (Class C) (1983), repealed and replaced by P.L.2001, ch. 383 § 10 (effective January 31, 2003) (current version at 17–A M.R.S.A. § 207(1)(A) (Supp.2004)); and two counts of terrorizing, 17–A M.R.S.A. § 210(1)(A) (Class C) (Supp.2001), amended by P.L.2001, ch. 383 § 11 (effective January 31, 2003) (current version at 17–A M.R.S.A. § 210(1)(A) (Supp. 2004)). Rega was also charged with tampering with a witness, 17–A M.R.S.A. § 454(1)(B)(2) (Class B) (Supp.2001), amended by P.L.2001, ch. 383 § 63 (effective January 31, 2003) (current version at 17–A M.R.S.A. § 454(1)(B)(2) (Supp.2004)), but it was dismissed by the State before trial.

he asked the whereabouts of the daughter, and the officer answered affirmatively. When asked what the wife had said before that point, the officer stated that she said Rega had held her against her will, threatened to kill her, and made her perform oral sex with a knife to her throat. The prosecutor then asked if the officer remembered anything else that the wife had told him, and he answered that she had said she was concerned about her daughter. Rega objected on the ground that the examination was beyond the scope of the excited utterance. The court ruled that the officer could relate the interview up to the point that the daughter's location was discussed. Rega did not move to strike any of the testimony that had been given nor did he request a curative instruction.

[¶ 10] The shop owner, who overheard the police interview with the wife, was asked by the prosecutor what the wife had said to the police. Rega objected, and the court reiterated the ruling it had made earlier on the extent of the excited utterance. The court stated that it would allow the shop owner's testimony up to the point of the cut-off line, referring to the point at which the wife answered police questions about the location of the daughter. After several failed attempts to find out if the shop owner could distinguish what the wife said before the cut-off line and after it, the prosecutor went on to other subjects. During redirect examination, the prosecutor asked the shop owner if he heard the wife mention the sexual assault to the police. When the shop owner responded affirmatively, the prosecutor asked if he remembered whether that discussion came before or after the wife's statements about the location of the daughter. The shop owner responded, "I believe that was after ... [she] was concerned about her daughter, very concerned about her daughter and she did tell the police that she had

been raped." Rega did not object or move to strike.

[¶ 11] After the shop owner had testified and during the testimony of the police officer who had recorded the interview, the prosecutor requested to play the recording of the police interview with the wife for the jury. At that point Rega's attorney informed the court that he had consulted with Rega and that they had changed their minds about wanting to keep the recording from the jury. Rega affirmatively requested that the entire tape recording be played for the jury and the court acceded to this request. After the jury listened to the tape, the prosecutor offered the tape itself into evidence, and Rega again stated that he had no objection.

[¶ 12] During the wife's testimony, the prosecutor asked her several questions about a written statement she had given to the police. When asked whether she agreed to have oral sex with Rega, the wife answered that she was not opposed to it and thought it would calm him down. She testified that she had not been feeling particularly amorous but that having sex with him was a better option than others. She testified that she was not tied at the time of the oral sex and that Rega told her what to do. The prosecutor then asked about the statement she had written for the police. She admitted that her written statement said that Rega had tied her and made her perform oral sex with a knife in his hands. Rega did not object, move to strike, or request a limiting instruction.

[¶ 13] In his opening statement, Rega's attorney told the jury that Rega's mental health would be an issue in the case, that the evidence would show he had a major psychotic episode and a break with reality. In fact, Rega had been examined prior to trial by a forensic psychologist and psychiatrist under the auspices of the State Forensic Service, pursuant to 15 M.R.S.A.

§ 101–B(1), (2) (2003). At trial, the psychologist who performed the examination was called by the State. Rega objected to the witness on the ground that the defense of abnormal state of mind had not yet been generated. The objection was overruled, and the State's expert testified that in his opinion Rega did not have any diagnosis for mental illness on the date of the offenses, and that although Rega was intoxicated, the intoxication did not impair his ability to recognize what he was doing. In the State expert's opinion Rega was aware of the consequences of his actions and was acting intentionally.[4]

[¶ 14] Rega was convicted of gross sexual assault and kidnapping.[5] The court imposed concurrent sentences of twenty and ten years respectively, suspending all but fifteen years, and six years of probation.

## II. DISCUSSION

### A. Out–of–Court Statements

 [¶ 15] Rega contends that the wife's out-of-court statements should not have been admitted. Specifically, he argues that it was error to admit the following: (1) the recording made by the police of the interview with the wife; (2) the police officer's testimony that the wife told him that Rega held a knife to her throat and made her perform sexual acts; (3) the shop owner's testimony that he overheard the wife tell the police that she had been raped; and (4) the wife's testimony about her written statement to the police.

### 1. Recording of the Police Interview of the Wife

[¶ 16] Although Rega argues that the recording of the police interview with the wife was inadmissible, he specifically withdrew his objection to the recording. He made an express request that the recording be played to the jury. He now contends that he was forced to request that the jury hear the recording in its entirety to mitigate the effect of the wife's out-of-court statements to the police and the shop owner regarding the sexual assault. However, Rega did not make that explanation to the trial court and has not explained to us how playing the entire recording to the jury would mitigate the other out-of-court statements.

 [¶ 17] Rega's withdrawal of his objection and his affirmative request that the recording be played for the jury is akin to a stipulation that it was admissible. When a party affirmatively agrees to a court action, that party has failed to preserve the action for appellate review. *Med. Care Dev. v. Bryler Corp.*, 634 A.2d 1296, 1299 (Me.1993). The same is true when a party affirmatively requests that evidence be presented to the jury. We do not review alleged errors that resulted from a party's trial strategy. *Aucella v. Town of Winslow*, 628 A.2d 120, 123 (Me. 1993). Rega has failed to preserve for appeal the admissibility of the recording of the police interview with the wife.

### 2. Police Officer's Testimony About the Wife's Statements

 [¶ 18] Rega made objections to the testimony of the police officer about the

4. Two experts were called by Rega to testify: another psychologist and the psychiatrist who had performed the 15 M.R.S.A. § 101–B(1), (2) examinations. The former testified that Rega suffered from a personality disorder, was having a delusional episode on the day of the incident, and his delusion strongly influenced his ability to form intent. The

psychiatrist testified that Rega's mental state impaired his ability to act rationally and effectively.

5. The jury also found Rega guilty on the four other Class B and C charges. No appeal has been taken from those convictions.

wife's statements to him regarding the sexual encounter, and the admissibility of the statements is reviewed for abuse of discretion. *See State v. Witham*, 1997 ME 77, ¶ 10, 692 A.2d 930, 934. This testimony was offered prior to the playing of the recording of the police interview with the wife. At the time the statements were offered they should not have been admitted because they were not part of the wife's excited utterance. The statements about sex were made after the police asked her the whereabouts of her daughter. The court ruled that it was at that point in the discussion where the wife had calmed down. Unfortunately, neither attorney was helpful to the court in pointing out, at side bar, where the statements about sex appeared in the context of the court's ruling on the excited utterance.

■ [¶ 19] However, the error in admitting the statements was harmless because it is highly probable that the error did not affect the verdict. *See Witham*, 1997 ME 77, ¶ 16, 692 A.2d at 935. There was other evidence regarding the sexual assault, even without all of the wife's out-of-court statements. First, there was the recording made at the house on which Rega was angry, screaming, and threatening to kill the wife. Also on the recording were Rega's statements that he was holding the wife as his hostage. The wife is heard telling him to put down the knife. Second, the wife testified about the oral sex, describing Rega as instructing her on what to do. She testified that performing oral sex was the better option available to her. She also related to the jury his threats to kill her. When the prosecutor asked her to describe what she meant by oral sex, the wife initially responded "he made me put ..." before she stopped herself. The reasonable inference from the recording at the house and the wife's testimony was

that if she did not engage in sex with him, he would carry out his threat of killing her.

3. Shop Owner's Testimony About the Wife's Statements

■ [¶ 20] During the direct examination of the shop owner, the prosecutor asked him a question about what he had heard the wife say to the police. Rega's objection to this question was sustained. After unsuccessful attempts at getting the shop owner to distinguish between statements made during the wife's excited utterances and those made when she had calmed down, the prosecutor gave up. Later, on redirect examination, when the prosecutor asked the shop owner whether he had heard the wife talk to the police about the "rape or sexual assault," the shop owner testified that he heard her say that she had been raped. Rega made no objection or motion to strike.

■ [¶ 21] Because there was no objection to testimony about the wife's statements during the redirect examination, we review the admissibility of the statement for obvious error. M.R.Crim. P. 52(b); M.R. Evid. 103(a), (e).

Under the obvious error standard, we review the admissibility of controverted testimony only when the error complained of is so highly prejudicial and so taints the proceeding as virtually to deprive the aggrieved party of a fair trial. In making such a determination we apply our best judgment to all the circumstances of the case at hand to determine whether inadmissible evidence received at trial was in its probable effect upon the jury a seriously prejudicial error tending to produce manifest injustice. *State v. Profenno*, 516 A.2d 201, 203 (Me. 1986) (citations, quotation marks, and ellipses omitted).

[¶ 22] There was no obvious error in the admission of this testimony. As stated

above, there was sufficient evidence from the wife's in-court testimony and from the recording made at the house for a jury to conclude that Rega committed the gross sexual assault.

### 4. Wife's Testimony About Her Written Statement

[¶ 23] Likewise, the wife's testimony about her written statement to the police was not objected to, and it is reviewed, therefore, for obvious error. M.R.Crim. P. 52(b); M.R. Evid. 103(a), (e). The testimony about the written statement was hearsay because it was offered to prove the truth that it asserted, that is, that the wife was forced to perform a sexual act at knifepoint. M.R. Evid. 801(c). It was not offered for the limited purpose of demonstrating that the wife's memory had diminished or for credibility purposes. *See State v. Benner*, 654 A.2d 435, 436–37 (Me.1995). The testimony about the written statement did not meet the requirements of M.R. Evid. 801(d)(1), for a prior statement by a witness, because it was not under oath or a statement of identification. Nor did it meet the requirement for recorded recollection in M.R. Evid. 803(5), because the wife did not testify that she was unable to recall the incident.

[¶ 24] However, the admission of the statement did not produce manifest injustice. By the time the wife testified, the jury had heard the recording of her statements to the police. The jury had also heard the recording made at the house described above. In addition, the wife testified to Rega's threats and his instructing her on what to do during the sexual act. As stated above, the reasonable inference from her in-court testimony and the recording made at the house was that if she did not engage in sex with him, he would fulfill his threat to kill her. The court did not obviously err in admitting the wife's testimony regarding her written statement.

### B. Sufficiency of the Evidence

[¶ 25] Rega first argues that because all of the wife's out-of-court statements to the police and the shop owner regarding the sexual assault are inadmissible, the evidence was insufficient for a conviction on gross sexual assault. As stated above, even without the wife's out-of-court statements, the jury could have reasonably inferred from her testimony and from the recording of the incident at the house that the wife submitted to Rega's sexual act by compulsion.

[¶ 26] Because there was sufficient evidence for the jury to convict Rega on the gross sexual assault charge, there was sufficient evidence of the kidnapping. The wife's testimony and the recording of the events at the house demonstrate that Rega restrained his wife and would not let her leave. While he was restraining her he subjected her to the gross sexual assault, and thus, the jury could infer that he restrained her with the intent to commit the sexual assault. Furthermore, there was evidence that Rega restrained the wife with the intent to inflict bodily injury on her. The recording demonstrated that several times the wife asked Rega to put down the knife and that Rega made numerous threats to kill her. This was enough for the jury to reasonably infer that Rega intended to inflict bodily injury on the wife, whether or not he actually did inflict injury. The shop owner testified, without objection, that when the wife first arrived at his store, she said that she had been stabbed. In addition, the police saw the cut on her head, and she had injuries on her hands. There was sufficient evidence to convict Rega on both the gross sexual assault and kidnapping charges.

### C. Testimony by the State's Psychological Expert

[¶ 27] Rega argues several issues arising from the testimony of the State's expert forensic psychologist. Although Rega objected to the testimony, he did so solely on the ground that the psychologist should not be allowed to testify as to Rega's state of mind because no evidence generating the defense of abnormal state of mind had been admitted. Rega made no other objections of the psychologist's testimony.

[¶ 28] Rega first argues that the court erred in admitting the psychologist's opinion that Rega did not have an abnormal condition of mind at the time of the offenses. He contends this was error because the defense of abnormal condition of mind had not been raised at the time the psychologist testified and was not relevant. A relevancy determination is reviewed for clear error. *Ames v. Ames*, 2003 ME 60, ¶ 13, 822 A.2d 1201, 1206.

[¶ 29] The pertinent statute states: "Evidence of an abnormal condition of the mind may raise a reasonable doubt as to the existence of a required culpable state of mind." 17-A M.R.S.A. § 38 (1983). Rega's argument that the abnormal condition of mind had not been raised at the time the State's expert testified goes only to the kidnapping charge because the crime of gross sexual assault does not require a culpable state of mind.[6] *See* 17-A M.R.S.A. § 253(1)(A).

[¶ 30] Rega's opening statement alerted the jury that Rega's mental state was an issue in the case. In addition, on cross-examination of Rega's wife, Rega asked questions regarding Rega's mental health history and hospitalizations, and she testified about his delusions of a conspiracy against him. Thus, in his opening statement and cross-examination, Rega opened the door to evidence about his mental condition. He made his mental state relevant. The court did not exceed the bounds of its discretion in determining that Rega had raised the issue of his state of mind and in allowing the psychologist to give his opinion on the subject.[7]

The entry is:

Judgment affirmed.

---

6. The offense of kidnapping requires that the defendant act "knowingly." 17-A M.R.S.A § 301(1)(A). In contrast, the statute defining the offense of gross sexual assault does not mention a culpable state of mind. 17-A M.R.S.A. § 253; *see State v. Saucier*, 421 A.2d 57, 59 (Me.1980).

7. Although Rega has argued several other issues concerning the State expert's testimony, they are reviewed for obvious error because he did not object on the grounds he argues to us. *See State v. Profenno*, 516 A.2d 201, 202–03 (Me.1986) (reviewing for obvious error the defendant's claim that the evidence was hearsay where objection at trial was made on other ground). None of the issues rise to the level of obvious error, and none merit discussion.