MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:     2019 ME 100
Docket:       Pis-18-417
Argued:       May 16, 2019
Decided:      June 20, 2019
Revised:      November 19, 2019

Panel:        SAUFLEY, C.J., and ALEXANDER, MEAD, GORMAN, JABAR, HJELM, and HUMPHREY, JJ.

## STATE OF MAINE

v.

## TIMOTHY D. CURTIS

ALEXANDER, J.

[¶1] Timothy D. Curtis appeals from a judgment of conviction entered by the trial court (Piscataquis County, *Anderson J.*) after a jury found him guilty of theft by unauthorized taking of a firearm (Class B), 17-A M.R.S. § 353(1)(B)(2) (2018), domestic violence criminal threatening (Class D), 17-A M.R.S. § 209-A(1)(A) (2018), domestic violence criminal threatening with a dangerous weapon (Class C), 17-A M.R.S. §§ 209-A(1)(A), 1252(4) (2018), domestic violence assault (Class D), 17-A M.R.S. § 207-A(1)(A) (2018), and unlawful possession of scheduled drugs (Class D), 17-A M.R.S. § 1107-A(1)(C)

2

(2018).[1]  Curtis challenges the sufficiency of the evidence and an evidentiary ruling made by the trial court.[2]  We affirm the judgment.

## I.  CASE HISTORY

[¶2]  Viewing the evidence in the light most favorable to the State, the jury could have found the following facts beyond a reasonable doubt.  *See State v. Nobles*, 2018 ME 26, ¶ 2, 179 A.3d 910.

[¶3]  On December 26, 2017, Curtis and a friend spent the day bobcat hunting in central Maine.  When the friend arrived home that evening, he realized that he could not find the .22 caliber pistol he had taken with him on the trip that day.  The following day, the friend and Curtis returned to the locations where they had previously hunted to look for the gun in the snow, but were unable to locate it.  Curtis helped the friend look for the gun on several subsequent occasions, but they could not find it, even with a metal detector.

---

[1]  Curtis was also convicted of a violation of condition of release (Class E), 15 M.R.S. § 1092(1)(A) (2018), after the court found him guilty of that count.

[2]  Curtis additionally challenges his sentence.  His application for authorization to appeal his sentence, *see* M.R. App. P. 20, was denied by the Sentence Review Panel in November 2018.  *See State v. Curtis*, No. SRP-18-416 (Me. Sent. Rev. Panel Nov. 21, 2018).  Because we discern no illegality in Curtis's sentence that appears on the face of the record and his argument that the sentence reflects an abuse of discretion is not cognizable on direct appeal, we do not address the issue further.  *See State v. Davenport*, 2016 ME 69, ¶¶ 8-9, 138 A.3d 1205.

The friend put up signs around the general area where they had been hunting seeking the lost gun and offering a reward for its recovery.

[¶4] At the time of the hunting trip, Curtis lived with his girlfriend and her two sons at a house in Sangerville. On January 8, 2018, while Curtis and the girlfriend were having an argument, the girlfriend's younger son—who was seventeen at the time—came out of his bedroom to check on his mother. Curtis was just a few feet away from the younger son and, upon seeing him, Curtis "puffed up," stepped toward the boy, and angrily inquired "do you want some of this?" This frightened the younger son and prompted him to retreat to the doorway of his bedroom.

[¶5] After the incident, the girlfriend told Curtis that she wanted him to leave the house and no longer wanted to be in a relationship with him. The girlfriend spent that night in the younger son's bedroom because she did not want to be around Curtis and was concerned about the younger son's safety after Curtis confronted him. Curtis hollered outside the door of the younger son's bedroom, "[W]hat kind of mother are you, sleeping with your son? He's 16, 17. And he must be a f-gg-t."

[¶6] The following morning, Curtis got up early and left to go hunting with his friend. The girlfriend went to a friend's house because she needed to

4

talk with someone. While at her friend's house that afternoon, the girlfriend received a series of threatening text messages from Curtis, such as "U better calll me b4 u regret it," and "Ur pissin off the wrong bull." Curtis also called her and angrily demanded that she come home immediately.

[¶7] Concerned for the safety of her sons, the girlfriend returned to the house and found Curtis—in a bout of apparent mania—sweeping and mopping the floors. The girlfriend knew that Curtis used Suboxone without a prescription and would act "very manic" if he took too much of the drug. The girlfriend and her sons avoided interacting with Curtis that evening, but when she attempted to sleep in the younger son's bedroom again, Curtis insisted that she sleep with him. The girlfriend agreed out of a desire to avoid further conflict.

[¶8] Once they were in their bedroom, Curtis would not let the girlfriend sleep; he kept asking her why she was treating him that way, calling her names like "dumb c--t," and begging her to have sex with him. When the girlfriend tried to leave the room, Curtis grabbed her by the hair and shook her head aggressively. He also grabbed her by the back of the neck and, at a different moment, held her down against the bed while grasping the front of her neck.

Every time he hurt her, he would apologize and then revert to calling her names and demanding sex.

[¶9] Curtis continued to act irrationally throughout the night. He told the girlfriend at one point that he was going to kill her and everyone in the house. He also took out a gun from underneath the mattress—a pistol the girlfriend had never seen before—and cocked it. Terrified, the girlfriend asked him if he was going to kill her and he said "no, I'm not going to kill you." He put the gun back under the mattress and resumed berating her. Eventually, Curtis took the gun out again, waved it around, and alternately pointed it at himself and the girlfriend. After he put the gun away, she remained with him because she "just wanted the night over with," and "knew that he would not give up." When Curtis fell asleep, the girlfriend lay awake next to him, too scared to leave the room; she prayed "that he would leave in the morning to go hunting."

[¶10] On the morning of January 10, 2018, Curtis's friend arrived at the house at approximately 7:00 a.m. to pick up Curtis for another hunting trip. After waiting to make sure Curtis was really gone, the girlfriend came out of the bedroom and went downstairs. Still shaken and frightened that Curtis might return, the girlfriend told her older son—who was eighteen—what had

happened during the night and said that they all had to leave the house as soon as possible. The older son immediately called 9-1-1.

[¶11] While waiting for the police to arrive, both sons worked to quickly gather Curtis's weapons—which included multiple rifles, a crossbow, and knives—but were unable to locate the pistol Curtis had used to threaten the girlfriend. They continued to look even after the police arrived, and eventually spotted the pistol underneath Curtis's bureau in the bedroom. A police officer retrieved the pistol and determined that there was a round in the chamber and bullets in the clip.

[¶12] The police located Curtis while he was hunting with the friend and placed him under arrest. After handcuffing him, an officer checked Curtis for any weapons and emptied his pockets. In one of Curtis's pockets, the officer found a small white container, which—when opened later at the Sheriff's Office—was found to contain what the officer identified as Suboxone strips.

[¶13] While the friend was speaking with the police after Curtis's arrest, the subject of the friend's missing pistol came up. He was able to provide police with a serial number that matched the one on the pistol that was found under Curtis's bureau, and to positively identify the gun in person. The friend had

never given Curtis permission to take the gun, and Curtis never told the friend that he had it.

[¶14]  In June 2018, Curtis was charged by indictment with theft by unauthorized taking of a firearm (Class B), 17-A M.R.S. § 353(1)(B)(2), domestic violence criminal threatening (Class D), 17-A M.R.S. § 209-A(1)(A), domestic violence criminal threatening with a dangerous weapon (Class C), 17-A M.R.S. §§ 209-A(1)(A), 1252(4), aggravated assault (Class B), 17-A M.R.S. § 208(1)(C) (2018), domestic violence assault (Class D), 17-A M.R.S. § 207-A(1)(A), violation of condition of release (Class E), 15 M.R.S. § 1092(1)(A) (2018), and unlawful possession of scheduled drugs (Class D), 17-A M.R.S. § 1107-A(1)(C).  Curtis pleaded not guilty to all the counts.

[¶15]  The case proceeded to a jury trial in July 2018.  Before the trial began, the court agreed to sever the count charging a violation of condition of release at Curtis's request, and Curtis waived his right to a jury trial on that count.  During trial, the court dismissed the aggravated assault count at the State's request.  After a two-day trial, the jury found Curtis guilty of all the remaining counts.  After the jury was excused, the court found Curtis guilty of the count of violation of condition of release.

[¶16] At the sentencing hearing, the court entered a judgment of conviction, sentencing Curtis to seven years of imprisonment with all but three years suspended on the conviction for theft of the firearm—which, as a Class B crime, was the highest charged offense—and three years of probation. The court imposed lesser, concurrent sentences on the remaining counts.[3]

[¶17] Curtis timely appealed. *See* 15 M.R.S. § 2115 (2018); M.R. App. P. 2B(b)(1).

## II. LEGAL ANALYSIS

A.      Sufficiency of the Evidence

[¶18] "We review a criminal defendant's challenge to the sufficiency of the evidence to support a conviction by viewing the evidence in the light most favorable to the State and determining whether a trier of fact rationally could find beyond a reasonable doubt every element of the offense charged." *State v. Tieman*, 2019 ME 60, ¶ 19, --- A.3d ---. When undertaking such a review, "[w]e defer to all credibility determinations" made by the jury, *State v. Cummings*, 2017 ME 143, ¶ 12, 166 A.3d 996, and will "not intrude on the jury's role to

---

[3] Although in its judgment of conviction the court correctly indicated that the aggravated assault count was dismissed—and that dismissal is indicated in the docket entries—the court also marked a box on the judgment indicating that Curtis was convicted of that count. The marking of the box is obviously a typographical error because the court did not impose a sentence on that count and the record is clear that the court dismissed the count during the trial.

resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts," *State v. Hansley*, 2019 ME 35, ¶ 22, 203 A.3d 827.

1.    Unlawful Possession of Scheduled Drugs

[¶19]  Curtis contends that the evidence was insufficient to support his conviction of unlawful possession of scheduled drugs.  He asserts that although he was charged with possession of Suboxone, the State presented evidence only that he was in possession of Suboxone strips, and that because the State failed to introduce evidence of a chemical analysis confirming that the strips were Suboxone, the evidence on that count is insufficient.

[¶20]  To support a verdict of guilty of unlawful possession of scheduled drugs, the record must demonstrate that Curtis intentionally or knowingly possessed what he knew or believed to be a scheduled drug, which was in fact a scheduled drug, and the drug was a schedule W drug.   17-A M.R.S. § 1107-A(1)(C).

[¶21]   At trial, the State called an investigator from the Piscataquis County Sheriff's Office to testify.  That investigator testified that he had worked on many drug investigations over his twenty-three-year career, had received training from the Maine Drug Enforcement Agency that included a forty-hour

course on drug identification, and had received yearly updates about new drugs. Based on that training and experience, he identified the contents of the white container that was in Curtis's pocket when he was arrested as small pieces of Suboxone strips. He testified that Suboxone is a "narcotic" that comes in "yellow-orange" strips about the size of postage stamps and that the strips—which are taken orally—have printed letters on them "like N2 or N8." The pieces, which matched the investigator's description, were admitted in evidence.

[¶22] In addition to the investigator's testimony, the girlfriend also testified that Curtis used Suboxone without a prescription—although she did indicate he had a prescription at one point in the past. She also testified that the night before his arrest, Curtis acted "very manic," as if he had been taking Suboxone, and that Curtis had written her a letter after his arrest in which he said that the only good thing that came from the incident was "getting off the subs," which the girlfriend understood to mean Suboxone.

[¶23] Curtis objected to the investigator's testimony at trial, arguing that the State had not introduced evidence of a chemical analysis confirming that the strips were Suboxone. The court allowed the investigator's testimony about what he thought the strips were, but sustained an objection when the

investigator identified the strips as just Suboxone. The court said: "I believe his original testimony was Suboxone strips, and he just said Suboxone. So I think there is a difference."

[¶24] Contrary to Curtis's contention, the form or delivery method of the drug is not relevant to elements of the crime of unlawful possession of scheduled drugs. *See* 17-A M.R.S. § 1107-A(1)(C); *see also* 17-A M.R.S. § 1102(1)(I) (2018) (categorizing schedule W drugs as including "any compound, mixture or preparation containing narcotic drugs in any quantity"). To the extent that Curtis is challenging the sufficiency of the indictment on this count, he has waived that argument by not raising it at the trial court level. *See State v. Foster*, 2016 ME 154, ¶ 8, 149 A.3d 542 ("We do not . . . review the [sufficiency of an indictment] at all when a defendant has knowingly and voluntarily waived the issue of an indictment's sufficiency by declining to request a bill of particulars or otherwise challenge the indictment in the trial court."); *see also* M.R.U. Crim. P. 12(b)(2).

[¶25] Curtis's argument regarding the lack of chemical analysis of the strips is similarly without merit. We have held that "[i]n the absence of a chemical analysis, other direct and circumstantial evidence can establish beyond a reasonable doubt the identity of drugs. That evidence can include the

testimony of a witness who has experience based on familiarity with the drugs through law enforcement, prior use, or trading." *State v. Barnard*, 2001 ME 80, ¶ 12, 772 A.2d 852; *see also United States v. Harrell*, 737 F.2d 971, 978 (11th Cir. 1984) (stating that controlled substances can be identified exclusively by circumstantial evidence, including "lay experience based on familiarity through prior use, trading, or law enforcement; a high sales price; on-the-scene remarks by a conspirator identifying the substance as a drug; and behavior characteristics of sales and use such as testing, weighing, cutting and peculiar ingestion"). It is "left to the jury to determine the weight to be given" to such testimony, "based on the knowledge, competence, training, and experience" of the witness. *Barnard*, 2001 ME 80, ¶ 14, 772 A.2d 852.

[¶26] The testimony of the police investigator and the girlfriend, when taken together and viewed in the light most favorable to the State, supports the jury's finding beyond a reasonable doubt that Curtis was guilty of the drug possession charge.

2. Other Sufficiency Challenges

[¶27] Curtis also contends that the evidence was insufficient to support his conviction of theft of a firearm because the State did not provide evidence of when he took possession of the friend's pistol, and one of the State's

witnesses—Curtis's cellmate at the county jail—testified that Curtis told him that he intended to return the pistol to the friend. The record provides ample evidence upon which the jury could have found every element of theft of the firearm proved beyond a reasonable doubt. *See* 17-A M.R.S. § 353(1)(B)(2); *see also State v. Hayward*, 2017 ME 33, ¶ 11, 156 A.3d 734. As for the cellmate's testimony that Curtis intended to return the pistol, we will not intrude on the jury's role to resolve conflicts in testimony. Moreover, the same witness testified that Curtis had told him that he hoped his hunting friend would forget about the gun. *See* 17-A M.R.S. § 352(3)(C) (2018) (intent to deprive can mean, among other things, "[t]o use or dispose of the property under circumstances that make it unlikely that the owner will recover it or that manifest an indifference as to whether the owner will recover it"); *Hansley*, 2019 ME 35, ¶ 22, 203 A.3d 827.

[¶28] Curtis additionally challenges the sufficiency of the evidence supporting his conviction of domestic violence criminal threatening as to the girlfriend's younger son. He argues that his conduct did not constitute a threat of bodily harm and thus any fear experienced by the younger son was not reasonable. He also maintains that the evidence does not support the conclusion that he and the younger son were household members. Once again,

there is sufficient evidence in the record upon which the jury could have found Curtis guilty of this crime. *See* 17-A M.R.S. §§ 209(1), 209-A(1)(A) (2018); 19-A M.R.S. § 4002(4) (2018) (stating that the definition of household member "includes individuals presently or formerly living together" and also "minor children of a household member when the defendant is an adult household member"); *State v. York*, 2006 ME 65, ¶ 11, 899 A.2d 780 ("We have construed section 209 as not requiring that a victim's fear be objectively reasonable. Evidence of a victim's subjective fear will support a conviction for criminal threatening.").

B.  Excited Utterance

[¶29]  Curtis argues that the court erred by admitting the testimony of the older son regarding statements his mother—the girlfriend—made to him after Curtis left the house on the morning of January 10, 2018.

[¶30]  A court may admit a hearsay statement pursuant to the excited utterance exception if it finds the following foundational elements: "(1) a startling event occurred; (2) the hearsay statement related to the startling event; and (3) the hearsay statement was made while the declarant was under the stress of excitement caused by that event." *State v. Sykes*, 2019 ME 43, ¶ 18, 204 A.3d 1282; *see* M.R. Evid. 803(2).  "We review the court's foundational

findings or implicit findings to support admissibility of evidence for clear error, and . . . will uphold those findings unless no competent evidence supports" them. *State v. Taylor*, 2011 ME 111, ¶ 20, 32 A.3d 440.

[¶31] The first two foundational elements are not at issue here. Competent evidence supports, and Curtis does not challenge, the court's implicit foundational findings that there had been startling events—the domestic violence assault and criminal threatening with a dangerous weapon—and that the girlfriend's statements to the older son related to those events. *See Sykes*, 2019 ME 43, ¶ 19, 204 A.3d 1282, (stating that "a domestic assault . . . can constitute a startling event for evidentiary purposes"); *State v. Kimball*, 2015 ME 67, ¶¶ 3, 19-20, 117 A.3d 585 (same).

[¶32] Curtis focuses his argument on the third foundational element. Curtis contends that the girlfriend was no longer under the stress of the startling events when she told her older son what Curtis had done to her because the events had happened hours before Curtis left the house, which gave the girlfriend "time to reflect." Curtis also contends that the element was not met because the girlfriend waited for a short period of time after Curtis left the house before going downstairs and speaking with her older son.

16

[¶33]  We have held that "[t]here is no bright line time limit to use in deciding when the stress of excitement caused by a startling event has dissipated." *State v. Watts*, 2007 ME 153, ¶ 6, 938 A.2d 21.  Rather, a court must consider a variety of factors, including

> the nature of the startling or stressful event, the amount of time that passed between the startling event and the statement, the declarant's opportunity or capacity for reflection or fabrication during that time, the nature of the statement itself, and the declarant's physical and emotional condition at the time of the statement.

*State v. Metzger*, 2010 ME 67, ¶ 10, 999 A.2d 947.

[¶34]  In this case, the court supportably found that the startling event did not end until Curtis left the house because the girlfriend did not dare leave the room based on Curtis's recent assault, threats, and other conduct she described.  It also found that she was "emotional" from the events and made the statements to her older son "within 20 minutes" after Curtis left.  The court acknowledged that the older son testified during voir dire that he had asked his mother questions, thus suggesting that her statements to him were "less under the influence of the event," but it also pointed out that the girlfriend told the older son, without any prompting, "[Curtis] has to go."

[¶35]  The court's implicit rejection of Curtis's arguments that the girlfriend was no longer under the stress of the events and had time to reflect

is supported by the evidence. Although the older son was not exact about how long it took for his mother to come downstairs and talk to him after Curtis left—he testified that it was after a "few minutes," and also that it could have been "half an hour maybe, 20 minutes"—he also testified that, when she did come down, his mother began telling him what happened "right away." Furthermore, the older son testified that his mother appeared "frightened" and "really shaken," and spoke to him in a "very crackly" voice. His testimony was consistent with the girlfriend's testimony that she had "waited for a little while just to . . . make sure [Curtis] was gone," before she went downstairs and that while she was talking to the older son she was "still petrified to death that [Curtis] was gonna come back."

[¶36] The evidence therefore supports a conclusion that the girlfriend had little opportunity—let alone the capacity—to reflect on the startling events either while lying scared in bed next to Curtis after he had violently assaulted her, threatened to kill everyone in the house, and pointed a gun at her, or while waiting in the bedroom for a short period after Curtis left to make sure he was really gone. *See Sykes*, 2019 ME 43, ¶¶ 21-22, 204 A.3d 1282; *Taylor*, 2011 ME 111, ¶¶ 24-30, 32 A.3d 440; *Watts*, 2007 ME 153, ¶ 8, 938 A.2d 21; *cf. State v. Rega*, 2005 ME 5, ¶¶ 3-5, 8-9, 18-19, 863 A.2d 917 (implicitly

affirming a trial court's determination that a victim's initial statement to police qualified as an excited utterance when those statements were made five to eight minutes after police were called after a two-hour-long incident in which the victim's husband took her hostage); *State v. Hafford*, 410 A.2d 219, 219-20 (Me. 1980) (holding that an assault victim's statement to a neighbor was admissible as an excited utterance even though the victim wrapped up his injured hand and waited several minutes after the attack until he felt it was safe to leave to seek help).

[¶37]  Accordingly, the trial court did not clearly err in finding that the girlfriend remained under the stress of excitement caused by Curtis's assault and threats when she made the statements to her older son and concluding that those statements qualified as excited utterances.  M.R. Evid. 803(2).

The entry is:

Judgment affirmed.

Jeffrey C. Toothaker, Esq. (orally), Ellsworth, for appellant Timothy D. Curtis

Marianne Lynch, District Attorney, and Mark A. Rucci, Asst. Dist. Atty. (orally), Prosecutorial District V, Bangor, for appellee State of Maine

Piscataquis County Unified Criminal Docket docket number CR-2018-04
FOR CLERK REFERENCE ONLY