MAINE SUPREME JUDICIAL COURT　　　　　　　　　　Reporter of Decisions
Decision:　　2024 ME 84
Docket:　　　And-23-68
Argued:　　　October 3, 2023
Decided:　　　December 31, 2024

Panel:　　　MEAD, HORTON, CONNORS, and DOUGLAS, JJ., and HJELM, A.R.J.*
Majority:　　MEAD, HORTON, CONNORS, and DOUGLAS, JJ.
Dissent:　　　HJELM, A.R.J.

STATE OF MAINE

v.

RAMEL L. SHEPPARD

MEAD, J.

[¶1]　Ramel L. Sheppard appeals from a judgment of conviction for domestic violence aggravated assault (Class B), 17-A M.R.S. § 208-D(1)(A) (2020),[1] entered by the trial court (Androscoggin County, *Stewart, J.*) following a jury trial at which the victim did not testify.　Sheppard contends that the court abused its discretion when it admitted in evidence as an excited utterance the victim's hearsay statement identifying him as her attacker, and erred in

---

* Although Justice Jabar participated in the appeal, he retired before this opinion was certified. Although he was not present at oral argument, Justice Hjelm participated in the development of this opinion. *See* M.R. App. P. 12(a)(2) ("A qualified Justice may participate in a decision even though not present at oral argument.").

[1] The statute has since been amended. P.L. 2021, ch. 647, § B-19 (effective Jan. 1, 2023); P.L. 2023, ch. 465, § 4 (effective Oct. 25, 2023). The amendments do not affect this appeal.

determining that the statement was nontestimonial and that its admission did not violate the Confrontation Clause of the United States Constitution, U.S. Const. amend. VI. We disagree and affirm the judgment.

## I. BACKGROUND

### A. Facts

[¶2] Viewing the evidence admitted at trial in the light most favorable to its verdict, the jury could rationally have found the following facts. *See State v. Healey*, 2024 ME 4, ¶ 2, 307 A.3d 1082. On June 3, 2020, Officer Spencer Simoneau of the Lewiston Police Department was on routine patrol. At about 6:00 a.m. he saw the victim walking near the corner of Bartlett Street and Walnut Street "appear[ing] to be distressed." Simoneau saw that the victim looked like she had been crying and that "something was wrong with her face." When he stopped and went to talk to her, the first thing she said to him was that "her boyfriend, Ramel Sheppard, had beat her up." Simoneau was then able to see that the victim's face was swollen; she was bleeding; and she had tears coming out of her eyes, one of which was "crooked" and not tracking equally.

[¶3] The victim did not want to talk to the officer roadside. She said that "she was scared and that she couldn't be seen with [him] on the side of the road." She accepted a ride to the hospital, where Simoneau photographed her

injuries and called the Department's domestic violence investigator. Based on information relayed by Simoneau, Sheppard was arrested at a residence on Oak Street; the arresting officer saw what appeared to be "relatively fresh blood" on the floor near the door.

[¶4] The victim arrived at the hospital at about 6:10 a.m. She told an emergency room nurse that "her boyfriend had assaulted her about 45 minutes before [she arrived at the emergency room], striking her in the face and head with his hands and fists." In making that report, the victim was "upset," "teary," and seemed "overwhelmed." The nurse observed that the "right side of [the victim's] face was quite swollen," especially her right eye, which "was looking up and out instead of forward." The victim also had dried blood around her nose. The Lewiston Police Department's domestic violence investigator came to the hospital and talked to the victim for several hours; during that time the investigator observed that the appearance of the victim's facial injuries seemed to be worsening.

## B.    Procedure

[¶5] Sheppard was indicted for domestic violence aggravated assault (Class B), 17-A M.R.S. § 208-D(1)(D) (Count 1); domestic violence assault

4

(Class D), 17-A M.R.S. § 207-A(1)(A) (2020)[2] (Counts 2 and 4); and domestic violence aggravated assault (Class B), 17-A M.R.S. § 208-D(1)(A) (Count 3).

[¶6]  The court held a jury trial on October 19 and 20, 2022.  At the beginning of the trial, the State dismissed Count 1.  After the State rested its case-in-chief, the court granted Sheppard's motion for a judgment of acquittal on Count 2.  The jury returned verdicts of guilty on Counts 3 and 4.

[¶7]  At the sentencing hearing, the court merged Count 4 into Count 3 and dismissed Count 4 without prejudice.  The court entered judgment on Count 3 and sentenced Sheppard to seven years' imprisonment, with all but forty months suspended, and three years of probation.  Sheppard timely appealed.  M.R. App. P. 2B(b)(1).

## II.  DISCUSSION

### A.  Excited Utterance

[¶8]  At the outset of the trial, Sheppard moved in limine to exclude the victim's hearsay statement to Simoneau that she had been assaulted by "her boyfriend, Ramel Sheppard," arguing that it did not qualify under the excited

---

[2] The statute has since been amended.  P.L. 2021, ch. 647, § B-17 (effective Jan. 1, 2023); P.L. 2023, ch. 465, § 2 (effective Oct. 25, 2023).  The amendments do not affect this appeal.

utterance exception to the hearsay rule.[3]  *See* M.R. Evid. 803(2).  That exception provides that "[a] statement relating to a startling event or condition, made while the declarant was under the stress of excitement that it caused," is "not excluded by the rule against hearsay."  *Id.*

[¶9]  On voir dire examination, Simoneau said that just before 6:00 a.m. on June 3, 2020, he made contact with the victim on Bartlett Street in Lewiston. Concerning that encounter, Simoneau testified:

> PROSECUTOR:  [D]id [the victim] flag you down, [or] did you stop on your own?
>
> SIMONEAU:  I just happened to see her out of the corner of my eye. She was walking.  She just seemed distressed and I could tell something was wrong with her face, so I just stopped and talked to her.
>
> Q:  When you stopped to speak with her, what was her demeanor like?
>
> A:  She was really upset, crying . . . I couldn't tell if [she] was crying because she was bleeding, her face was swollen.
>
> Q:  She was actively bleeding at the time that you made contact with her?
>
> A:  Yes, she was.
>
> Q:  Prior to asking her any questions about her injuries, did she make statements to you?

---

[3] The parties represented to the court that the victim could not be located for trial.

A: Yes.

Q: What did she say?

A: She said that her boyfriend, Ramel Sheppard, had assaulted her.

Q: Specifically at this time she said that he beat her up?

A: Yes.

Q: How quickly into your interaction with her was it that this happened, that she said that?

A: Basically as soon as I got out of the car.

Q: Was she still crying and upset at the time she said that to you?

A: Yes.

Q: Still actively bleeding from her face?

A: Yes.

. . . .

DEFENSE COUNSEL: . . . You indicate in your report, I stopped and I spoke to her, and then you said, while speaking to her [I] made observations. What was your conversation about when you said you spoke to her?

A: Just like I said, when she said that she had been assaulted and then she said that she didn't want to talk to me right there, she was scared, and I offered to bring her to the hospital so we could talk more.

. . . .

Q: . . . She was able to respond to your questions, correct?

A: I—I didn't really ask her any questions.

. . . .

THE COURT: [Y]ou drove past her?

A: Yeah. Well, I could just see her kind of—there's like an open field. I can just kind of see her. As I drove, I just pulled up past her, stopped the car.

. . . .

Q: So from the moment you saw her until getting out of the car without being face to face, how much time elapsed?

A: Maybe ten seconds.

Q: So you were able to stop immediately?

A: Yeah. . . . She like kind of walked towards me, towards my car. I got out.

. . . .

Q: [W]here was she looking as she's walking . . . ?

A: Just straight ahead. . . .

Q: She wasn't . . . looking towards you?

A: No.

Q: Did it look like she was searching you down or searching an officer down, or was she just walking in this state [of distress]?

A: She was just walking.

8

[¶10]  The domestic violence investigator testified on voir dire about her conversation with the victim at the hospital.  The victim told the investigator that after leaving the scene of the assault she had walked to a friend's house about a half mile away, stopping briefly to get some money without going inside, and then had continued walking a short distance when she encountered Simoneau about twenty minutes after the assault.

[¶11]  Ruling on Sheppard's motion, the court made factual findings in determining that the victim's statement qualified as an excited utterance:

> [T]he court can find that . . . the moment [Simoneau] first saw [the victim] roughly 40 to 50 feet away from him he observed [her] walking, sort of looking not towards him but in a different direction. . . . [S]he at that time had not seen the officer and [the] moment he saw her she was upset—in obvious distress, crying.  He could tell something was wrong with her face.  Her nose was running.
>
> . . . [H]e stops almost immediately.  He said it might have been ten seconds from his first sighting of her [until] he's actually . . . face to face.  That ten seconds involved him simply stopping the car . . . [and] getting out of the car and in that period from when he first saw her to when he encountered her, [the victim] had continued walking up towards the corner of the street.  Upon getting . . . face-to-face, he could see that she was at that time actively bleeding.
>
> . . . And it was immediately upon confronting her that she made the statement that she had been assaulted by her boyfriend, Ramel Sheppard. . . .
>
> . . . [A]pproximately 20 minutes elapsed from the moment

that [the victim] indicates she had been assaulted to [when] an encounter with Officer Simoneau occurred.

. . . .

The amount of time that passed . . . is 20 minutes.

. . . .

. . . [Concerning] the nature of the [victim's] statement. I will say it was a spontaneous statement in the sense of when she first encountered the officer, it was spontaneous. It's the first thing that she said.

. . . [The victim's] physical and emotional condition all point [to a finding] that she is under stress, again, those findings being that she was in obvious distress, crying, nose is running, apparent injury with some active bleeding still occurring.

. . . [O]n [the] issue of whether she had an opportunity for reflection and fabrication, . . . in a normal situation while walking for 20 minutes there might be time for that reflection but in this case what we have is that [in] that moment that the officer . . . first sees her—and there's no evidence to suggest that she had already seen the officer—she is already [showing] this indicia of distress. . . .

And ten seconds—assuming she even saw the officer then, we don't know exactly, assuming it was something less than ten seconds, I don't feel that it was [enough] time for her to reflect about I'm now seeing an officer so I better get my story straight.

. . . .

. . . [A]gain, the facts of this case, how quickly it was from the officer making the spontaneous observation of her being in distress, her not knowing the officer was there, I don't believe there was time for her to reflect and fabricate.

. . . .

. . . [T]here was a startling event, and I'm finding that [the victim's] statement . . . was spontaneous and unreflecting in the sense of her not knowing she was about to encounter an officer and it [was] something that she immediately says with all [of] the other observations that have been made.

So I am finding that that statement will meet [the requirements for] the exception [as an] excited utterance.[4]

[¶12] We have said that "[a] court may admit a hearsay statement pursuant to the excited utterance exception if it finds the following foundational elements: (1) a startling event occurred; (2) the hearsay statement related to the startling event; and (3) the hearsay statement was made while the declarant was under the stress of excitement caused by that event." *State v. Curtis*, 2019 ME 100, ¶ 30, 210 A.3d 834 (quotation marks omitted).

[¶13] Sheppard does not challenge the court's finding that the first and second elements were satisfied. Rather, he contends that the third element—requiring that the victim's statement have been made while she was under the stress of excitement caused by the assault—was not. *See id.*; M.R. Evid. 803(2).

---

[4] The testimony that Simoneau and the investigator later gave before the jury about their interactions with the victim was consistent with their voir dire testimony.

[¶14]  "We review the court's foundational findings or implicit findings to support admissibility of evidence for clear error, and will uphold those findings unless no competent evidence supports them."  *Curtis*, 2019 ME 100, ¶ 30, 210 A.3d 834 (alteration and quotation marks omitted).  We review for an abuse of discretion the court's ultimate decision to admit the hearsay statement.  *State v. Sykes*, 2019 ME 43, ¶ 15, 204 A.3d 1282.  The trial court's factual findings here are well-supported by the record.[5]

[¶15]  In applying those findings to the applicable test,

> [w]e have held that there is no bright line time limit to use in deciding when the stress of excitement caused by a startling event has dissipated.  Rather, a court must consider a variety of factors, including the nature of the startling or stressful event, the amount of time that passed between the startling event and the statement, the declarant's opportunity or capacity for reflection or fabrication during that time, the nature of the statement itself, and the declarant's physical and emotional condition at the time of the statement.

*Curtis*, 2019 ME 100, ¶ 33, 210 A.3d 834 (alteration, citation, and quotation marks omitted).

---

[5]  The dissent posits that our review of the trial court's decision to admit the victim's statement identifying Sheppard as her assailant is confined to the evidence adduced at the voir dire hearing on Sheppard's motion in limine and may not include any evidence admitted at trial.  Dissenting Opinion ¶ 63.  Although the trial court's decision on the motion provided guidance, the actual admission of the evidence occurred at trial without objection tendered on the then-existing trial record.  Regardless, we see no significant distinction between the evidence offered at the hearing on the motion and the evidence presented at trial that alters our analysis or conclusion.

[¶16]  Here, the victim made her spontaneous statement, which directly concerned a very serious event that by its nature was both startling and stressful, about twenty minutes after it occurred.  At that time her physical and emotional condition were such that the officer felt compelled to stop and investigate even though the victim was simply walking along a public street.  She had no time to reflect on or fabricate the statement because it was made to a police officer whom she did not summon, and did not know was coming, within ten seconds of his appearance.

[¶17]  Contrary to Sheppard's chief contention, the twenty-minute interval between the assault and the victim's statement is not, given the other factors found by the court, dispositive of whether she had an opportunity to fabricate the statement.  As Sheppard concedes, in *Curtis* we affirmed the trial court's finding that a statement made "within 20 minutes" following an assault qualified as an excited utterance.  *Id.* ¶¶ 34, 37.

[¶18]  On this record, we have no difficulty in concluding that the trial court did not clearly err in finding that the victim remained under the stress of excitement caused by Sheppard's assault when she made the statement to Simoneau identifying Sheppard as her attacker, and thus did not abuse its discretion in admitting the statement as an excited utterance.  *See id.* ¶ 37;

*Sykes*, 2019 ME 43, ¶ 15, 204 A.3d 1282.

## B.    Confrontation

[¶19]    Sheppard also contends that the admission of the victim's statement identifying him as her assailant violated his constitutional right to confront her at trial.[6]  "[S]tatements that are admissible pursuant to the rules of evidence—such as the [excited utterance] exception at issue here—may be inadmissible when tested against the Confrontation Clause."  *State v. Adams*, 2019 ME 132, ¶ 20, 214 A.3d 496 (quotation marks omitted).  We have recognized that

> [t]he federal Confrontation Clause, which applies to the states through the Fourteenth Amendment, provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him."  U.S. Const. amend. VI.  Article I, section 6 of the Maine Constitution provides similarly that "[i]n all criminal prosecutions, the accused shall have a right . . . [t]o be confronted by the witnesses against the accused."  Even if an out-of-court statement is admissible pursuant to an exception to the hearsay rule, these constitutional provisions bar the admission of *testimonial* statements of a witness who did not appear at trial unless he [or she] was unavailable to testify, and the defendant had had a prior opportunity for cross-examination.  *Nontestimonial*

---

[6]  Although Sheppard makes a passing reference to the Maine Constitution in his brief, the argument is undeveloped.  Accordingly, we deem it waived and limit our analysis to federal Confrontation Clause jurisprudence.  *See Mehlhorn v. Derby,* 2006 ME 110, ¶ 11, 905 A.2d 290; *State v. Shepard*, 2022 ME 11, ¶ 14, 268 A.3d 274.

statements, on the other hand, do not trigger the protections of the Confrontation Clause.

*Sykes*, 2019 ME 43, ¶ 24, 204 A.3d 1282 (citations and quotation marks omitted).

[¶20]   The trial court's "legal conclusions that certain statements are nontestimonial, and therefore admissible over Confrontation Clause objections, are reviewed de novo."  *State v. Kimball*, 2015 ME 67, ¶ 14, 117 A.3d 585; *see Adams*, 2019 ME 132, ¶ 19, 214 A.3d 496.  Here the court found:

> In this case it's clearly not an interrogation because the evidence presented . . . is that . . . the officer had not even asked a question . . . . That by itself doesn't make [the victim's statement] non-testimonial, but . . . I've already made . . . findings this was a spontaneous statement made by the declarant when she first encountered the officer . . . [the victim] wasn't expecting [him], she wasn't looking [for him], . . . nor was there evidence that she was trying to flee or evade the officer, [it was a] spontaneous statement that she made to him in the first encounter in the condition [she was in] so I'm making a finding that it's not a testimonial statement for confrontation[] purposes, so the statement will be admissible.

We conclude that the court's determination that the victim's statement was nontestimonial, and thus admissible, was correct.

[¶21]   "[W]hether [a statement] is testimonial and thus barred by the Confrontation Clause . . . is necessarily a fact-specific inquiry."  *State v. Metzger*, 2010 ME 67, ¶ 22, 999 A.2d 947.  The Supreme Court has recognized that a volunteered statement may be testimonial.  *See Melendez-Diaz v. Massachusetts*,

557 U.S. 305, 316 (2009).  That said, the circumstances here, where the victim, still suffering from the immediate aftereffects of being beaten, made her spontaneous statement to Officer Simoneau within ten seconds of becoming aware that he was present and before he could ask a single question, are, in our view, ultimately dispositive.

### 1.    *Crawford v. Washington* and *State v. Barnes*

[¶22]  Shortly after the Supreme Court handed down its seminal decision in *Crawford v. Washington*, 541 U.S. 36 (2004), in which the Court held that the admission of testimonial hearsay violates the Confrontation Clause absent a prior opportunity for cross-examination, *id.* at 68-69, we decided a case where a murder victim had, more than a year before her death, driven herself to a police station "sobbing and crying . . . and . . . said that her son had assaulted her and had threatened to kill her."  *State v. Barnes*, 2004 ME 105, ¶¶ 2-3, 854 A.2d 208.  Holding that the victim's statement was nontestimonial, we said that

> [a] number of factors support this determination.  First, the police did not seek her out.  She went to the police station on her own, not at the demand or request of the police.  Second, her statements to them were made when she was still under the stress of the alleged assault.  Any questions posed to her by the police were presented in the context of determining why she was distressed.  Third, she was not responding to tactically structured police questioning as in *Crawford*, but was instead seeking safety and aid.  The police were

> not questioning her regarding known criminal activity and did not have reason, until her own statements were made, to believe that a person or persons had been involved in any specific wrongdoing. Considering all of these facts in their context, we conclude that interaction between Barnes's mother and the officer was not structured police interrogation triggering the cross-examination requirement of the Confrontation Clause as interpreted by the Court in *Crawford*.

*Id.* ¶ 11.

[¶23] Our analysis then is relevant now. Here, the police did not seek out the victim. Her statement was made while she was still under the stress of the assault. Simoneau asked no questions to prompt the statement—thus no "tactically structured police questioning" was involved—and his contact with the victim occurred only in the context of determining why she was distressed. Applying our analysis in *Barnes* results in the same conclusion reached by the trial court—the victim's statement was nontestimonial and therefore admissible.

[¶24] Not surprisingly, there have been cases decided since *Barnes* and *Crawford* in which we and the Supreme Court have explored the testimonial versus nontestimonial distinction and the circumstances that result in a hearsay statement falling into one category or the other. We now turn to a review of particularly significant decisions and their effect on our analysis.

## 2. *Davis v. Washington*

[¶25]   In *Davis v. Washington*, when considering the admissibility of a 9-1-1 recording in which the victim identified her assailant, the Supreme Court set out a basic test:

> Without attempting to produce an exhaustive classification of all conceivable statements—or even all conceivable statements in response to police interrogation—as either testimonial or nontestimonial, it suffices to decide the present cases to hold as follows: Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency.  They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

547 U.S. 813, 817-18, 822 (2006).  The *Davis* Court explained the nuances of the "primary purpose" test in emphasizing that

> in *Crawford*, . . . we had immediately in mind . . . interrogations solely directed at establishing the facts of a past crime, in order to identify (or provide evidence to convict) the perpetrator. . . . A 911 call, on the other hand, and at least the initial interrogation conducted in connection with a 911 call, is ordinarily not designed primarily to establish or prove some past fact, but to describe current circumstances requiring police assistance.

*Id.* at 826-27 (alterations, citations, and quotation marks omitted).

[¶26]   The Court also stressed the significance of the particular circumstances of the case being reviewed:

18

> [T]he difference in the level of formality between the two interviews [in *Crawford* and *Davis*] is striking.  Crawford was responding calmly, at the station house, to a series of questions, with the officer-interrogator taping and making notes of her answers; [the *Davis* victim's] frantic answers were provided over the phone, in an environment that was not tranquil, or even . . . safe.
>
> We conclude from all this that the circumstances of [the *Davis* victim's] interrogation objectively indicate its primary purpose was to enable police assistance to meet an ongoing emergency.  She simply was not acting as a *witness*; she was not *testifying*.  What she said was not a weaker substitute for live testimony at trial . . . .

*Id.* at 827-28 (quotation marks omitted).

[¶27]  Here, applying the holding of *Davis*, the trial court was justified in finding that Sheppard's victim made her unprompted, spontaneous roadside statement "to enable police assistance to meet an ongoing emergency"—the emergency being that she had been severely beaten by her boyfriend only twenty minutes earlier and her injuries were continuing to worsen—and not to act as evidence in a potential future prosecution of the perpetrator.  *Id.* at 828. Unlike in the case of a 9-1-1 call, the victim here did not *initiate* contact with police—quite to the contrary, she did not know she was going to have contact with a police officer until Simoneau's sudden appearance in front of her.  The *Davis* Court anticipated just such a circumstance when it noted that in a domestic violence context, "officers called to investigate need to know whom they are dealing with in order to assess the situation, the threat to their own

safety, and possible danger to the potential victim. Such exigencies may *often* mean that initial inquiries produce nontestimonial statements." *Id.* at 831 (alterations, citation, and quotation marks omitted).

### 3. *Michigan v. Bryant*

[¶28] Five years after deciding *Davis*, the Supreme Court further refined what is meant by "an ongoing emergency" when it considered a case where police found a gunshot victim on the ground about twenty-five minutes after the shooting, asked him "what had happened, who had shot him, and where the shooting had occurred," and received answers that were later admitted at the defendant's trial. *Michigan v. Bryant*, 562 U.S. 344, 349-50, 377 (2011) (quotation marks omitted). In holding that the statements were nontestimonial, the Court explained that

> [t]he basic purpose of the Confrontation Clause was to target the sort of abuses exemplified at the notorious treason trial of Sir Walter Raleigh. Thus, the most important instances in which the Clause restricts the introduction of out-of-court statements are those in which state actors are involved in a formal, out-of-court interrogation of a witness to obtain evidence for trial. . . . When, as in *Davis*, the primary purpose of an interrogation is to respond to an ongoing emergency, its purpose is not to create a record for trial and thus is not within the scope of the Clause.

*Id.* at 357-58 (alteration, citation, footnote, and quotation marks omitted).

Important to the present case, the Court's analysis went further:

But there may be *other* circumstances, aside from ongoing emergencies, when a statement is not procured with a primary purpose of creating an out-of-court substitute for trial testimony. In making the primary purpose determination, standard rules of hearsay, designed to identify some statements as reliable, will be relevant. Where no such primary purpose exists, the admissibility of a statement is the concern of state and federal rules of evidence, not the Confrontation Clause.

. . . [The] context [of this case] requires us to provide additional clarification with regard to what *Davis* meant by "the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency."[7]

*Id.* at 358-59 (quoting *Davis*, 547 U.S. at 822).

[¶29] The Court said that determining the "primary purpose" of a challenged statement in a given case requires

[a]n objective analysis of the circumstances of an encounter and the statements and actions of the parties to it[, which] provides the most accurate assessment of the "primary purpose of the interrogation." The circumstances in which an encounter occurs . . . are clearly matters of objective fact. The statements and actions of the parties must also be objectively evaluated. That is, the relevant inquiry is not the subjective or actual purpose of the individuals involved in a particular encounter, but rather the purpose that reasonable participants would have had, as ascertained from the individual's statements and actions and the circumstances in which the encounter occurred.

. . . .

---

[7] As the dissent states: "[T]he existence of an ongoing emergency is among the most important factors used to determine if a statement is testimonial . . . ." Dissenting Opinion ¶ 82. We simply disagree with the dissent's conclusion that in this case "there was no ongoing emergency," *id.* ¶ 81.

> This logic is not unlike that justifying the excited utterance exception in hearsay law.

*Id.* at 360-61 (footnote omitted).

[¶30]   In applying this test, the Court explained, it is wrong to "erroneously read *Davis* as deciding that . . . statements made after the defendant stopped assaulting the victim and left the premises did *not* occur during an ongoing emergency. . . . [Rather,] whether an emergency exists and is ongoing is a highly context-dependent inquiry."  *Id.* at 363 (quotation marks omitted).  Indeed, "whether an ongoing emergency exists is *simply one factor*— albeit an important factor—that informs the ultimate inquiry regarding the 'primary purpose' of an interrogation."  *Id.* at 366 (emphasis added).

[¶31]   We do not make the analytical error identified by the Court. Viewing these facts objectively, as we have explained, leads us to conclude that the victim's primary purpose in making her spontaneous statement identifying Sheppard as her attacker was to resolve what the *Bryant* Court held may be included in the category of "an ongoing emergency."

[¶32]   Our conclusion is further supported by the *Bryant* Court's discussion of additional factors relevant to the "primary purpose" analysis. One such factor is "[t]he medical condition of the victim[, which] is important to the primary purpose inquiry to the extent that it sheds light on the ability of the

22

victim to have any purpose at all in responding to police questions and on the likelihood that any purpose formed would necessarily be a testimonial one." *Id.* at 364-65; *see id.* at 375. Here, the trial court found that the victim was still crying and bleeding, with her face swelling and her eye significantly injured, when she encountered Simoneau. We think it highly unlikely that in her physical and emotional condition the victim was able to formulate a plan to incriminate Sheppard and have him prosecuted in the fleeting ten-second interval between Simoneau's appearance and her unsolicited statement to the officer.

[¶33] The dissent's analysis suggests the existence of a bright-line rule inexorably leading to a conclusion that under defined circumstances "a declarant *can only have had* a significant appreciation that the information would be used to investigate and prosecute the person she accused."[8] Dissenting Opinion ¶ 76 (emphasis added). We disagree with that notion. Each

---

[8] *See* Dissenting Opinion ¶ 76:

> Going so far as to identify the perpetrator was unrelated to any effort to seek immediate assistance. Surely, when the particular circumstances before us are viewed through an objective lens—including the fact that the accusation was leveled temporally and geographically remotely from the crime, that the statement specified who committed the crime, and that it was made to a police officer with no one else around—such a declarant can only have had a significant appreciation that the information would be used to investigate and prosecute the person she accused.

case requires a review of its unique facts and circumstances, followed by an objective, but flexible, evaluation as to whether a challenged statement was testimonial for purposes of the Confrontation Clause.

[¶34]   Another relevant factor to a primary purpose analysis is "the importance of *informality* in an encounter between a victim and police."  *Bryant*, 562 U.S. at 366; *see id.* at 377; *id.* at 378 (Thomas, J., concurring in the judgment) ("[The victim's] questioning by police lacked sufficient formality and solemnity for his statements to be considered 'testimonial.'").  In *Bryant*, "the questioning . . . occurred in an exposed, public area, prior to the arrival of emergency medical services, and in a disorganized fashion.  All of those facts make [a] case distinguishable from the formal station-house interrogation in *Crawford*."  *Id.* at 366.  Precisely the same circumstances are found in the situation we consider here.

[¶35] Further,

> [v]ictims are . . . likely to have mixed motives when they make statements to the police.  During an ongoing emergency, a victim is most likely to want the threat to her . . . to end, but that does not necessarily mean that the victim wants or envisions prosecution of the assailant.  A victim may want the attacker to be incapacitated temporarily or rehabilitated.  Alternatively, a severely injured victim may have no purpose at all in answering questions posed; the answers may be simply reflexive. The victim's injuries could be so debilitating as to prevent her from thinking sufficiently clearly to understand whether her statements are for the purpose of

addressing an ongoing emergency or for the purpose of future prosecution. Taking into account a victim's injuries does not transform this objective inquiry into a subjective one. The inquiry is still objective because it focuses on the understanding and purpose of a reasonable victim in the circumstances of the actual victim—circumstances that prominently include the victim's physical state.

*Id.* at 368-69 (footnote omitted).

[¶36] Here, the victim did not want to immediately give Simoneau all of the details of the assault beyond initially—and likely reflexively, given the ten seconds she had to consider her statement—telling him why she was in the state she was in. Her primary concern was that she not be seen talking to the police on the side of the road. One could presume that if the victim had as her primary purpose a desire to have Sheppard arrested and prosecuted, she would have, at the first opportunity, given the officer all of the details needed to make sure that happened.

[¶37] In sum, as the Court explained in *Bryant*, in this case, "[b]ecause the circumstances of the encounter as well as the statements and actions of [the victim] and the police objectively indicate that the primary purpose of the [victim's statement] was to enable police assistance to meet an ongoing emergency, [the victim's] identification . . . of [her attacker] . . . [was] not testimonial hearsay. The Confrontation Clause did not bar [its] admission at

[Sheppard's] trial." *Id.* at 377-78 (citation and quotation marks omitted).

### 4. *Ohio v. Clark*

[¶38]  Four years after deciding *Bryant*, the Court restated the principles set out in that case and summarized them thusly: "[U]nder our precedents, a statement cannot fall within the Confrontation Clause unless its primary purpose was testimonial.  Where no such primary purpose exists, the admissibility of a statement is the concern of state and federal rules of evidence, not the Confrontation Clause."  *Ohio v. Clark*, 576 U.S. 237, 245 (2015) (quotation marks omitted).

### 5. Maine decisions

[¶39]  Following *Barnes*, we decided several cases reaching the issue of whether a challenged statement is testimonial or nontestimonial.  Among those relevant here are

- *State v. Adams*, where we noted that "[f]or purposes of the Confrontation Clause, testimonial statements are out-of-court statements made *primarily* to establish or prove past events potentially relevant to later criminal prosecution."  2019 ME 132, ¶ 20 n.8, 214 A.3d 496 (emphasis added) (quotation marks omitted).

- *State v. Kimball*, where we recognized that whether a statement is testimonial is "necessarily a fact-specific inquiry" and said that "[a]n 'ongoing emergency' is by its nature broader than the attack itself; it includes the victim's untreated injuries, the ongoing stress of the event, and the possibility that the assailant is still at large and could attack the victim again."  2015 ME 67, ¶¶ 18, 25, 117 A.3d 585 (quotation marks

omitted).

- *State v. Williams*, where we said: "An out-of-court statement is testimonial when it is a solemn declaration or affirmation made for the purpose of establishing or proving some fact. If a statement was made under circumstances that would lead an objective witness reasonably to believe that the statement would be available for use at a later trial, then the statement is testimonial for the purposes of the Confrontation Clause." 2012 ME 63, ¶ 27, 52 A.3d 911 (citation and quotation marks omitted).

## 6.    Conclusion

[¶40]  Applying the decisions of the Supreme Court in *Crawford*, *Davis*, *Bryant*, and *Clark*, and our decisions reached in light of that case law, to the facts found by the trial court, we conclude that the victim's statement to Officer Simoneau—made spontaneously and reflexively, without any opportunity for reflection or fabrication, and while coping with recent injuries—was not made for the primary purpose of giving evidence against Sheppard, but rather for the purpose of resolving a current and ongoing emergency.  Accordingly, the statement was nontestimonial and the trial court did not err in admitting it in evidence.

The entry is:

Judgment affirmed.

_____

HJELM, A.R.J., dissenting.

[¶41]  "[My] boyfriend, Ramel Sheppard[,] . . . assaulted [me]."

[¶42]  That accusation—made to a police officer, without prompting, and after the emergency surrounding the assault had subsided—is a "testimonial" statement as measured by the principles of constitutional confrontation protections.  I agree that the trial court did not exceed the breadth of its discretion by determining, after the declarant did not appear for trial, that the admission of her extrajudicial statement in evidence was not barred by hearsay rules.  When, however, the court also determined that Sheppard's constitutional right to confront that accuser would not be violated if the evidence were admitted, the court erred.  For that reason, I respectfully dissent from the Court's conclusion to the contrary.

[¶43]  In this separate opinion, I will first discuss the law of confrontation rights germane to this case (Part I).  Then, after touching on the standard of review governing this appeal (Part II(A)), I will explain the reasons why, in my view, the declarant's statement was inadmissible as a constitutional matter because that evidence could properly be presented to the jury only if she had appeared in court to testify and the defendant, Ramel Sheppard, had the opportunity to cross-examine her (Parts II(B)(1) and (2)).

## I.  THE CONSTITUTIONAL RIGHT TO CONFRONT WITNESSES

[¶44]  As one component of the Sixth Amendment, the Confrontation Clause ensures that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him."  U.S. Const. amend. VI.  This federal protection governs proceedings in state courts, *Pointer v. Texas*, 380 U.S. 400, 403 (1965), and has been applied by Maine's courts for more than half a century, *see, e.g., Cote v. State*, 286 A.2d 868, 873 (Me. 1972).[9]  For years, the federally-based right of confrontation was closely aligned with the rules of evidence.  Pursuant to that approach, admission of an out-of-court statement would not be barred by the Confrontation Clause, even when the declarant was unavailable to testify at trial, so long as the statement carried "adequate 'indicia of reliability'"—meaning that the statement fell within "a firmly rooted hearsay exception" or was otherwise supported by "particularized guarantees of trustworthiness."  *Ohio v. Roberts*, 448 U.S. 56, 66 (1980).[10]

---

[9]  Article I section 6 of the Maine Constitution contains a similar guarantee, in phraseology that is essentially identical to the federal provision.  But as the Court notes, Court's Opinion ¶ 19 n.6, Sheppard has not presented a meaningful argument that Maine's Constitution augments the confrontation protections created by the United States Constitution, so my discussion is grounded on the federal right, as understood from federal authority.

[10]  As a general matter, certain categories of hearsay become admissible at trial because the various criteria for admissibility provide some indicia of reliability.  *See* Field & Murray, *Maine Evidence* § 803 at 458 (6th ed. 2007).  This accounts for the reason why excited utterances, in particular, may be admissible despite being hearsay because such statements, by their nature, "overcome the presumption of untrustworthiness which the hearsay rule generally attaches to extrajudicial statements."  *State v. Anderson*, 409 A.2d 1290, 1302 (Me. 1979).  Accordingly, the two

[¶45]  The jurisprudential landscape governing confrontation rights was changed fundamentally with the landmark decision of *Crawford v. Washington*, 541 U.S. 36 (2004).  There, the Supreme Court of the United States repudiated the standard it had announced in *Roberts* and imposed a new test to determine when the Confrontation Clause bars the admission of evidence of an extrajudicial statement made by a declarant who did not appear at trial and whom the accused had not had an opportunity to cross-examine.  *Id.* at 50-65.  The new test arises from the language of the Constitution itself—that the right of confrontation arises when the declarant is a "witness[]."  *Id.* at 51 (quotation marks omitted).  From that starting point, the Court invoked a formula: a "witness" is someone who "bear[s] testimony," and "testimony" is "typically a solemn declaration or affirmation made for the purpose of establishing or proving some fact."  *Id.* (quotation marks and alteration omitted).

[¶46]  In overruling *Roberts*, the *Crawford* Court made explicit that the abuses remedied by the Confrontation Clause are unrelated to any conception that the right was designed merely to exclude unreliable evidence, which instead is the point of the hearsay rules.  *Id.* at 59-65; *see supra* n.10.  As the

categories of evidence enumerated in *Roberts*—some classic categories of hearsay statements as well as other hearsay statements that bear a high level of trustworthiness—are conceptually similar to each other.

Court put it, "we do not think the Framers meant to leave the Sixth Amendment's protection to the vagaries of the rules of evidence, much less to amorphous notions of 'reliability.'" *Crawford*, 541 U.S. at 61. Rather, the constitutional inquiry is qualitatively different from any determination of admissibility pursuant to the rules of evidence because the former is grounded, not in a court's administrative rules, but instead in an historical understanding of the reasons why the constitutional protection arose. *Id.* at 42-59. At bottom, irrespective of any determination that the evidence is reliable, admission of evidence of an out-of-court statement is barred by the Confrontation Clause if the statement is "[t]estimonial," the declarant is unavailable to testify at trial, and the accused had no prior opportunity to cross-examine the declarant. *Id.* at 59.

[¶47] Of course, as relevant to this case, the next question is, What *is* a testimonial statement? This critical question arises because if the out-of-court statement is *not* testimonial, the demands of the right of confrontation are not implicated. *Crawford* provides the definition of a testimonial declaration quoted above and further explains that the nature of a testimonial statement is "*ex parte* in-court testimony or its functional equivalent." *Id.* at 51 (quotation marks omitted). *Crawford* offers some examples of a "core class" of testimonial

declarations. Those examples include affidavits, custodial interrogations, and other prior testimony that was not subject to cross-examination by the defendant—namely, "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." *Id.* at 51-52 (quotation marks omitted). The Court nonetheless approached the issue with modesty and left "for another day any effort to spell out a comprehensive definition of 'testimonial.'" *Id.* at 68.

[¶48] The Supreme Court's subsequent decision in *Davis v. Washington,* issued two years after *Crawford*, took a material step in that direction by introducing another characteristic of an out-of-court statement that would be considered to determine if it is testimonial. 547 U.S. 813 (2006). That characteristic appears to draw on *Crawford*'s focus on how a person in the declarant's circumstances would reasonably expect the statement to be used. Again making clear that the principle was not exhaustive, *Davis* delineated testimonial and nontestimonial statements in the following way:

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the *primary purpose* of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the *primary purpose* of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

*Id.* at 822 (emphases added).

[¶49]  *Davis* involved statements made by a witness to the police during questioning, so the Court framed the new standard in a way that presupposes a dialogue.  *Id.* at 830.  Importantly for our case, however, the Court also clarified that a statement that was *not* the product of police interrogation nonetheless could be testimonial because "[t]he Framers were no more willing to exempt from cross-examination volunteered testimony . . . than they were to exempt answers to detailed interrogation."  *Id.* at 822 n.1; *see Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 316 (2009).  Ultimately, the inquiry focuses on the declarant's statements, which, after all, would constitute the evidence, rather than on any questions that generated the out-of-court statements—or on whether there were any questions at all.  *Davis*, 547 U.S. at 822 n.1.

[¶50]  The Court's opinion in *Davis* actually comprised decisions in two separate cases.  In one, the declarant made statements to an emergency dispatcher about dangerous events that were happening contemporaneously.  *Id.* at 827, 829.  These were deemed to be nontestimonial because the statements were elicited to resolve a present emergency. *Id.*  In the second case, a witness answered questions posed by investigators about past events and in a formal setting, after the underlying emergency had passed.  *Id.* at 830.  The

Court concluded that those statements were testimonial and therefore constitutionally inadmissible given that the declarant was not available to testify at trial and the defendant had not had a prior opportunity to cross-examine her. *Id.* at 829-32.

[¶51] The next major jurisprudential development that is instructive here—and, in my view, it is *highly* instructive—was the Supreme Court's decision in *Michigan v. Bryant*, 562 U.S. 344 (2011). There, the Court further explored the notion of an "ongoing emergency," which had been identified in *Davis*, quoted above, as an important circumstance when determining whether a statement made in that context is testimonial. *Id.* at 359 (quotation marks omitted). In *Bryant*, the Court reiterated and emphasized the salience of the "ongoing emergency" inquiry, calling it "among the most important circumstances informing the primary purpose" of the statement. *Id.* at 361 (quotation marks omitted); *see also id.* at 366, 370. The Court enumerated a series of considerations that bear on the "primary purpose" of an out-of-court statement—whether, as a primary example, the statement addresses an ongoing emergency or whether it is more in line with an effort to provide evidence for a future prosecution. *Id.* at 358. In the end, these factors arise from an understanding that "the existence and duration of an emergency

depend on the type and scope of danger posed to the victim, the police, and the public." *Id.* at 370-71.

[¶52] With the caveat that the determination of whether an ongoing emergency exists is "a highly context-dependent inquiry," *id.* at 363, the Court identified the following considerations:

- Was the dispute that created the emergency "purely private," or was it one that also endangered people in addition to the original victim, including the police and the public? *Id.* at 363, 372-73. In this context, the Court observed that "[d]omestic violence cases . . . often have a narrower zone of potential victims than cases involving threats to public safety." *Id.* at 363.

- Did the threat or violence involve a firearm or other dangerous weapon? *Id.* at 364, 373-74. For example, if the assailant acted without an implement and "was armed only with his fists," an emergency may end when the victim is in a location separate from the perpetrator. *Id.* at 364; *see State v. Judkins*, 2024 ME 45, ¶ 17, 319 A.3d 443. But if a gun is involved, an emergency may endure well past "the violent act itself." *Bryant*, 562 U.S. at 374.

- What was the perpetrator's motivation for causing the harm? *Id.* at 372, 374, 377.

- What was the declarant's medical condition when she made the statement? *Id.* at 364-65. This consideration is "important . . . to the extent that it sheds light on . . . the likelihood that any purpose formed would necessarily be a testimonial one." *Id.* at 365.

- Was the statement made in a formal setting, which is more indicative of a purpose of developing evidence that would be used in a later criminal prosecution? *Id.* at 366. The Court tempered this point, however, by cautioning that even though formality suggests that there is no ongoing emergency, the converse may not be true—"informality does not

necessarily indicate the presence of an emergency or the lack of testimonial intent." *Id.* at 366.

[¶53] These and other pertinent circumstances are to be examined objectively—that is, not as an attempt to divine "the subjective or actual purpose of the individuals involved in a particular encounter, but rather the purpose that reasonable participants would have had, as ascertained from the individuals' statements and actions and the circumstances in which the encounter occurred." *Id.* at 360.

[¶54] With these legal principles in mind, I now turn to their bearing on the case before us.

## II. THE TESTIMONIAL NATURE OF THE VICTIM'S ACCUSATION

## A. Standard of Review

[¶55] Any discussion of the issues on an appeal first requires consideration of the standard of review. In appeals that have presented challenges based on the Confrontation Clause, we have stated that we will review de novo a trial court's "legal conclusions that certain statements are nontestimonial, and therefore admissible over Confrontation Clause objections." *State v. Kimball*, 2015 ME 67, ¶ 14, 117 A.3d 585; *see Judkins*, 2024 ME 45, ¶ 11, 319 A.3d 443 ("We review de novo the impact of the admission of testimony on the constitutional right to confront witnesses."

(quotation marks omitted)); *State v. Sykes*, 2019 ME 43, ¶ 15, 204 A.3d 1282 (stating that, when an assertion is made on appeal of a "constitutional deprivation" based on the Confrontation Clause, "we review de novo the court's decision to admit the evidence"); *see also State v. Johnson*, 2014 ME 83, ¶ 8, 95 A.3d 621 ("We review the application of the Confrontation Clause de novo."); *State v. Rickett*, 2009 ME 22, ¶ 9, 967 A.2d 671 (stating that, in addressing a Confrontation Clause challenge on appeal, we "review [the trial court's] legal conclusions de novo").

[¶56]   Despite this language, we have also implied—but not stated explicitly—that, in confrontation cases, a trial court's findings of fact underlying its legal determinations are entitled to deference, with appellate review for clear error only, meaning that express and implied findings of fact will be set aside only if not supported by any competent evidence.  *Sykes*, 2019 ME 43, ¶ 15, 204 A.3d 1282.  This case exemplifies the reason for deference to be given to factual findings because, during the pretrial hearing on the admissibility of the out-of-court statement, the court was called upon to evaluate the testimonial credibility of the police officer to whom the victim reported the assault.  As we have often said, we are in no position to make assessments of credibility and evidentiary weight based on "a cold transcript."  *See, e.g., State*

*v. Patterson*, 2005 ME 26, ¶ 16, 868 A.2d 188; *State v. Robards*, 623 A.2d 168, 169 (Me. 1993).  Accordingly, I defer to the factual determinations made by the trial court.

[¶57]  When combined with the de novo standard of review for *legal* determinations, this results in a bifurcated standard—deferential for factual findings, de novo for legal conclusions.[11]  That, however, is not the end of the matter because some nuance may be necessary to locate the line separating facts from legal determinations.  *See Fortune v. State*, 2017 ME 61, ¶ 13, 158 A.3d 512 (stating, in a post-conviction case, "We recognize that such a 'mix' of legal and factual questions can be difficult to tease apart."); *State v. Hunt*, 2016 ME 172, ¶ 33, 151 A.3d 911 (stating that our adoption of a bifurcated standard in cases involving the voluntariness of confessions left unresolved "the contours of the analysis" because of "confusion about the precise location of the line between the facts to be determined—exclusively the task of the trial court—and the legal question of the ultimate determination regarding

---

[11] A bifurcated standard distinguishing between factual findings and legal determinations in cases where constitutional rights are at stake is not unfamiliar in the criminal law.  *See, e.g., Fortune v. State*, 2017 ME 61, ¶ 12, 158 A.3d 512 (post-conviction claims of ineffective assistance of counsel); *State v. Nadeau*, 2010 ME 71, ¶ 18, 1 A.3d 445 (consent to search); *State v. Tuplin*, 2006 ME 83, ¶ 13, 901 A.2d 792 (waiver of right to testify at trial); *State v. Watson*, 2006 ME 80, ¶ 31, 900 A.2d 702 (waiver of right to trial counsel); *State v. Coombs*, 1998 ME 1, ¶¶ 7-8, 704 A.2d 387 (voluntariness of confessions).

voluntariness" (quotation marks omitted)). The same may be true here, with a blend of elements: facts to be considered with deference to the trial court's findings; an articulation of the legal test to be applied, which is a pure legal exercise; and an analysis somewhere in the middle where the legal criteria are applied to the facts.

[¶58] A precise demarcation of that line, however, is an issue that I do not address because the State has not argued that the standard of review should be refined by narrowing the scope of issues to be reviewed de novo (something that would be to the State's benefit, at least in appeals brought by a defendant who challenges an adverse confrontation ruling by the trial court). Rather, in its brief the State recites only the de novo language taken from our caselaw. I therefore address the merits in this case giving deference to the trial court's factual findings but considering all other aspects of the issues as in the first instance, without any such deference.

[¶59] Determination of the proper standard of review also implicates the question of whether Sheppard preserved the confrontation issue at trial. Here, during the trial proper, when the State presented the jury with evidence of the victim's extrajudicial statement during its case-in-chief, Sheppard did not object. In some circumstances, this would result in a waiver of the challenge on

appeal and allow narrower appellate review that is significantly deferential to the trial court and therefore more favorable to the proponent of the evidence. *Sykes*, 2019 ME 43, ¶ 13, 204 A.3d 1282. Here, however, the admissibility of the statement was explicitly litigated during a pretrial hearing, and the court's resulting ruling that the evidence would be admitted over Sheppard's Confrontation Clause objection was clear and definitive. Consequently, the absence of an objection when the State presented the evidence during trial in no way renders the appellate challenge unpreserved. *See Sykes*, 2019 ME 43, ¶¶ 14-15, 204 A.3d 1282. To the extent the Court suggests otherwise, *see* Court's Opinion ¶ 14 n.5, I disagree. Sheppard's challenge on appeal therefore is properly treated as being fully before us.

[¶60] As a final point regarding the standard of review, any error committed by the court in its ruling is not harmless. The State presented evidence, without objection, that when the victim was treated at a hospital, she told a nurse that "her boyfriend had assaulted her," and medical records with the same information were admitted into evidence. The *only* evidence identifying *Sheppard* as her boyfriend, however, is contained in the extrajudicial statement she made to the patrol officer, which is the subject of this appeal. The "boyfriend" is otherwise unnamed and would not allow a jury

to reasonably make the connection to Sheppard himself. Therefore, the issue presented here is consequential, and any associated error is far from harmless. *See Judkins*, 2024 ME 45, ¶¶ 22-28, 319 A.3d 443.

## B. Application of the Law to the Facts

[¶61] Now, the merits.

[¶62] On the morning when trial was scheduled to begin, the parties advised the court that the named victim could not be located and so would not appear to testify. The State signaled that it nonetheless wanted to present evidence of a statement she had made to a police officer. Sheppard requested that the court hold a pretrial hearing, out of the jury's presence, to determine whether the out-of-court statement was admissible both within an exception to the hearsay rule and consistent with his constitutional right of confrontation. The witnesses who testified during the pretrial hearing were the patrol officer to whom the victim made the statement and another officer, who talked with her later at the hospital.

[¶63] After hearing the evidence, the court announced its findings of fact, all of which have support in the record. I recount the findings here, without reference to evidence that was presented later, during the trial proper. This is because if, as I maintain and discuss above, we defer to the trial court's factual

determinations to the extent supported by the record evidence, we must look *only* to the record developed during the pretrial proceeding that generated the court's ruling. In its Opinion, the Court refers also to the *trial* record, Court's Opinion ¶¶ 2-4, 27, 36, and, in fact, explicitly confirms that it is engaging in an analysis that blends the motion hearing record and the trial record, *id.* ¶ 14 n.5. But the Court cannot have it both ways—deferring to the trial court's factual findings and also bolstering support for those findings with evidence that had not yet even been presented to the court. The record we may properly review should be limited to the evidence presented by the parties to the trial court during the pretrial motion hearing, which necessarily was the predicate for the court's ruling. Accordingly, the following outline of the trial court's findings and supporting evidence does not, for example, report evidence about the magnitude of the victim's injuries that the State—for whatever reason—chose *not* to present during the motion hearing but offered in more detail later, during the trial in its case-in-chief, *after* the court had already ruled on the issue before us.

[¶64] On a day in early June of 2020, at around 6:00 a.m., a Lewiston patrol officer was on duty in a cruiser and saw a woman walking. It appeared to the officer that "something was wrong with her face" and that she looked to

42

be in distress. When the officer stopped to check on her, he saw that her face was swollen and bleeding. The officer testified that the woman promptly and spontaneously told him "that her boyfriend, Ramel Sheppard, had assaulted her." Additionally, although not referenced in the court's express findings, evidence was presented during the in limine hearing that she also told the officer that she was scared, that she did not want to talk with him there, and that she accepted the officer's offer to drive her to the hospital.

[¶65] The assault had occurred nearly a mile from where the officer encountered the victim on the street. At the hospital, the victim told a different police officer, a domestic violence investigator, that after the assault, she left the location where it had happened and stopped at a friend's house, which was roughly one-half mile from where the assault occurred, to get money. She then left the friend's residence and continued on, until the patrol officer saw her and stopped to check on her. Approximately twenty minutes elapsed between the assault and her contact with the patrol officer.

[¶66] The court concluded that the out-of-court statement would not be excluded by the general prohibition against the admission of hearsay evidence because the statement was an excited utterance—there had been a startling event, the statement was related to it, and it was made while the declarant was

under the stress of the event. *See* M.R. Evid. 803(2). The court then also determined that the statement was not testimonial for the combined reasons that it was made under those circumstances, which meet the hearsay rule's definition of an excited utterance, and that it was made spontaneously to a person she had not expected to encounter.

[¶67] I agree with the Court that the trial court did not exceed the scope of its discretion by concluding that the out-of-court statement fell within the excited utterance hearsay exception. Court's Opinion ¶ 18. In my view, this conclusion on appeal is a function of the tolerant standard of review governing appellate review of a ruling based on the rules of hearsay. *See State v. Curtis*, 2019 ME 100, ¶ 30, 210 A.3d 834 ("We review the court's foundational findings or implicit findings to support admissibility of [excited utterance] evidence for clear error, and . . . will uphold those findings unless no competent evidence supports them." (quotation marks omitted)).

[¶68] As I explain above, however, *Crawford* and its progeny make clear that when it comes to the Confrontation Clause, the analysis is fundamentally different from hearsay law in two ways. *Crawford*, 541 U.S. at 59-65. First, *Crawford* established that a determination of whether admission of the evidence at issue would violate the accused's right of confrontation is unrelated

to the hearsay framework. *Id.* at 42-59. This pronouncement is why *Crawford* is such an important case—by overruling *Roberts*, which had essentially equated the content of the Confrontation Clause with at least some of a court's administrative rules allowing the admission of certain hearsay evidence. And second, as I discuss above, the legal aspects of a ruling based on the Confrontation Clause are subject to de novo review on appeal, in marked contrast to the deferential standard of review of rulings based on rules of evidence.

[¶69]   I will first consider whether, as a legal matter, there was an "ongoing emergency" attendant to the out-of-court statement given that, as I note above, the *Bryant* Court described that consideration as among the most important ones relevant to determining if the statement was testimonial. 562 U.S. at 361. Then, because the Supreme Court also has made clear that a statement may be nontestimonial even in the absence of an "ongoing emergency," *Ohio v. Clark*, 576 U.S. 237, 244-45 (2015); *Bryant*, 562 U.S. at 358, I will consider whether the statement is testimonial as seen from a more general perspective.

### 1. Ongoing Emergency

[¶70] From an objective perspective, which is the one we are required to take, *Bryant*, 562 U.S. at 368-69, there was no *ongoing* emergency when the victim told the officer what had happened to her and who was responsible. The victim had been assaulted, resulting in visible injuries of facial bleeding and swelling. To be clear, this assault—by its very nature and as shown by her injuries—*had* created an emergency. But by the time the officer encountered the victim, that emergency, as understood within Confrontation Clause jurisprudence, had dissipated. This is manifest from the salient factors known to her, as set out by the Supreme Court in *Bryant* and which I now discuss seriatim.

[¶71] First, the victim reported to the officer that it was her boyfriend who assaulted her. In other words, this was an incident of domestic violence— which *Bryant* characterizes as a private dispute rather than one that poses a risk of harm to a larger universe of people such as members of the public or the officer himself, 562 U.S. at 363, 372-73. Here, when she talked to the patrol officer, the victim was no longer in the defendant's presence and, in fact, was twenty minutes and nearly a mile removed from him. Moreover, she was in the immediate presence of a police officer and had the safety he could provide her.

And even beyond those factors, after the victim had left the scene of the assault, she went to a friend's residence—not to hide or to seek shelter or protection—but to get money, and she then chose to leave that residence and continued on, outside on the street, further demonstrating that the emergency had dissipated. A reasonable person objectively viewing the situation could not perceive that the emergency was still happening by the time she talked to the officer.

[¶72]   Second, although the victim did not specify how Sheppard assaulted her, there was no indication that he had used a weapon.  As stated by the Supreme Court, this reduces the specter of an ongoing emergency, compared to a situation, for example, where the perpetrator had used a firearm or other comparable weapon, which broadens a threat to public safety.  As the *Bryant* Court explained, when the assailant uses "only . . . his fists," the emergency created by the assault may be seen to end when the victim is physically separated from and is no longer in the presence of the assailant. 562 U.S. at 364.  That was the situation the victim was in when she made the accusation to the patrol officer.

[¶73]  These factors lead to the next consideration, which accounts for the motivation leading to the assault.  *Bryant*, 562 U.S. at 372, 374, 377.  Again, because the assault occurred in the context of a domestic crime without

evidence of weaponry, the emergency subsided when the victim left the defendant's presence.

[¶74] Fourth, when the victim reported the assault to the officer, she was in evident distress and had observable injuries to her face, prompting the officer to offer to transport her to the hospital. Her emotional and physical condition is relevant to the extent that her immediate situation bears on the purpose, viewed objectively, that someone in those circumstances would have in telling the officer what had happened. *Id.* at 360. In contrast to a calm and controlled situation, the victim's circumstances, taken alone, could support the conclusion that the purpose of the disclosure was, at least in part, to seek assistance rather than to provide prosecutorial information. For several reasons, however, any such conclusion here is questionable and, at the very least, carries less significance than it might in other situations.

[¶75] As I note above, although she had been injured by the assault, there was no longer an emergency.

[¶76] But perhaps even more tellingly, the *content* of the victim's statement reveals why she spontaneously told the officer what had happened. She did not say simply that she had been assaulted. If that were the extent of her disclosure, it would match more closely with an intent primarily to seek

48

medical help.  If she had even said only that her boyfriend had assaulted her,

that would be more supportive of a conclusion that she reported the incident

for the purpose of getting aid.  But instead of limiting the scope of her disclosure

in those ways, she specifically named her assailant—her statement was that her

boyfriend, *Ramel Sheppard*, had assaulted her.  And she made that disclosure to

a law enforcement officer.  Going so far as to identify the perpetrator was

unrelated to any effort to seek immediate assistance.  Surely, when the

particular circumstances before us are viewed through an objective lens—

including the fact that the accusation was leveled temporally and

geographically remotely from the crime, that the statement specified who

committed the crime, and that it was made to a police officer with no one else

around—such a declarant can only have had a significant appreciation that the

information would be used to investigate and prosecute the person she

accused.[12]

[¶77]  In this context, another aspect of the trial court's analysis bears

mention.  As I noted above, the trial court imported, wholesale, its excited

---

[12]  The Court asserts that I state this as a categorical proposition.  Court's Opinion ¶ 33.  I do not.  My observation is explicitly predicated on the circumstances presented in this case, just as the Supreme Court has instructed, *see Michigan v. Bryant*, 562 U.S. 344, 363 (2011)—a principle I recognize above, *supra* ¶ 52.

utterance analysis into its ultimate determination that admission of the out-of-court statement would not violate Sheppard's confrontation right. When, as here, this approach is taken without clarification or nuance, at the very least the court runs the risk of committing the analytical mistake that was addressed as the core of *Crawford* and allowing the confrontation issue to turn on the subjective, emotional condition of the declarant—a proper hearsay consideration but not a proper constitutional factor.

[¶78] This is because *Crawford* makes clear that the rationale and purposes of the Confrontation Clause and the excited utterance hearsay exception are entirely separate from and unrelated to each other. Among other things, a determination that a hearsay statement is admissible as an excited utterance requires a finding that the declarant made the statement while under the influence of the startling event. M.R. Evid. 803(2); *Curtis*, 2019 ME 100, ¶ 30, 210 A.3d 834. This is entirely a subjective criterion, unlike the confrontation analysis, which is objectively based. In this way, the theory goes, the hearsay framework provides some inherent measure of reliability because it requires a showing that the declarant was actually so affected by the startling event so as to make fabrication unlikely. *See Sykes*, 2019 ME 43, ¶ 18, 204 A.3d 1282; *State v. Anderson*, 409 A.2d 1290, 1302 (Me. 1979). The right of

confrontation, in contrast, is not rooted in concerns for the statement's reliability but rather is a function of the criminal process itself. *Crawford*, 541 U.S. at 58-68. Therefore, it would be a mistake to say that an out-of-court statement meeting the test of the hearsay exception is necessarily or even presumptively nontestimonial within the meaning of the Confrontation Clause—in other words, that someone who was so under the influence of the startling event (the hearsay question) could not have had the wherewithal to intend that the statement be used for prosecutorial purposes (the Confrontation Clause question). Were it otherwise, *any* statement that falls within the excited utterance exception would, definitionally, also be admissible within the constitutional framework—a notion found in *Ohio v. Roberts* but later abandoned in *Crawford*.

[¶79] This case presents a good example of that situation: the out-of-court statement was admissible hearsay but, in my view, constitutionally inadmissible. Our recent decision in *Judkins* reiterated this point, stating that, pursuant to the federal constitution, "evidence that would otherwise be admissible under an exception to the hearsay rule may be barred by the Confrontation Clause." 2024 ME 45, ¶ 16, 319 A.3d 443 (quotation marks

omitted). Therefore, a declarant's excited state is far from dispositive on the question of whether the statement was nontestimonial.

[¶80] Finally, pursuant to the *Bryant* framework I outline above, the formality of the setting is to be considered. Here, the victim made the statement to an officer on the street and without any prompting or lead-in from the officer. This is certainly an unstructured and informal environment, distinct from, say, an investigatory interrogation about a past criminal event conducted at a police station, which is cited as an example of a formal situation. *See Clark*, 576 U.S. at 245; *Bryant*, 562 U.S. at 357, 366; *Crawford*, 541 U.S. at 52. When the out-of-court statement is made in an informal setting, the statement is "less likely" to be testimonial. *Clark*, 576 U.S. at 245. But informality is not dispositive on the issue; as the Supreme Court has stated, simply because a statement was made in an informal setting does not mean that there was an ongoing emergency or that the declarant's purpose was something other than leveling an accusation to aid in an investigation. *Bryant*, 562 U.S. at 366. In the case before us, while the *setting* was informal, the statement itself was indicative of formality because "[a]n accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not." *Crawford*, 541 U.S. at 51. As

I explain above, a victim's choice in a nonemergency environment to specifically name her assailant tends to reveal an understanding that the information would be used to investigate and possibly prosecute him, just as a person who makes such a statement in a more formal setting would expect. Nonetheless, to the extent there is a lack of formality attendant to the present situation, it is a factor that is relevant to the constitutional question, and it is one that I consider as part of the wider analysis.

[¶81]  And in that wider analysis, drawn from an objective view of the circumstances surrounding the declaration, I can conclude only that there was no ongoing emergency.  When the victim made the statement, she was outside and with a uniformed police officer but with no one else around.  The assault was domestic, with no indicia of a threat to others.  The crime had occurred nearly a mile from where the officer encountered the victim, and she had walked that distance out in the open.  During the approximately twenty minutes that had elapsed since the assault, she had gone to a friend's residence but did not seek sanctuary or protection; rather, she went only to pick up money.  I do not minimize her distress, which was plain to the officer, but the fact remains that, objectively, the emergency had passed.

[¶82]  Pursuant to controlling federal case law, the existence of an ongoing emergency is among the most important factors used to determine if a statement is testimonial, *Bryant*, 562 U.S. at 361, and it was not present here. Pursuant to this central aspect of the constitutional inquiry, admission at trial of the nontestifying accuser's statement as part of the patrol officer's testimony violated Sheppard's right of confrontation.

## 2.  Primary Purpose

[¶83]  Despite the centrality of the ongoing-emergency factor to the constitutional framework, the analysis does not end there.  That is because, several times now, the Supreme Court has made clear that it has not attempted to articulate an exhaustive list of circumstances that define and distinguish between testimonial and nontestimonial statements.  *Clark*, 576 U.S. at 244-45; *Bryant*, 562 U.S. at 356-58; *Davis*, 547 U.S. at 822; *Crawford*, 541 U.S. at 68.  The Court has explained, however, that the identification of those circumstances is a function of the broader principle first set out in *Crawford*, namely, that "testimony" is a "solemn declaration of affirmation made for the purpose of establishing or proving some fact."  *Id.* at 51 (quotation marks omitted); *see Clark*, 576 U.S. at 244; *Bryant*, 562 U.S. at 358 (stating that when "the primary purpose of an interrogation is to respond to an 'ongoing emergency,' its

purpose is not to create a record for trial and thus is not within the scope of the [Confrontation] Clause."); *Davis*, 547 U.S. at 822. In determining the primary purpose behind the declaration, the salient question remains what a "reasonable participant[]" would have intended based on the statements actually made and the surrounding circumstances. *Bryant*, 562 U.S. at 360.

[¶84] The substance and detail of the victim's accusation establish, in my view, that the purpose of a reasonable person in her circumstances would have been to provide the police with specific, inculpatory information about the assault. In particular, as I discuss above, when she told the patrol officer what had happened, her choice to identify Sheppard by name and by relationship would make clear to a reasonable participant that she was providing information that would assist in a future prosecution against Sheppard. As the situation is seen through an objective lens, if the victim were making only a "cry for help," *see Davis*, 547 U.S. at 832, or if she had only been seeking medical assistance, there would have been no reason to say anything other than she had been assaulted. But by also saying that it was her boyfriend who perpetrated the assault *and* that her boyfriend's name was Ramel Sheppard, her statement manifestly ranges into testimony. Further, she provided this information to a *police officer*, a person with known investigative and arrest authority. She also

knew that the threat posed by Sheppard had ended almost a mile away and twenty minutes before. The diminishment of the threat is objectively revealed further by her detour to a friend's house, for the limited purpose of getting money and not seeking refuge. And despite her subjective distress, she was in the immediate presence of the officer, a source of protection. Given all these circumstances, seen objectively, a crime victim can only have understood that her accusation was "potentially relevant to later criminal prosecution" of Sheppard. *See id.* at 822.

[¶85] Therefore, even going beyond the "ongoing emergency" analysis, when the bedrock "primary purpose" principle is invoked, it is evident that the victim's out-of-court accusation of Sheppard was testimonial.

### III. CONCLUSION

[¶86] The trial court did not commit reversible error when it concluded that the victim's extrajudicial statement to a police officer was not subject to exclusion as inadmissible hearsay. The same statement, however, was testimonial because, when she accused Sheppard, specifically, of having assaulted her, she bore witness against him. As a constitutional requirement, her out-of-court statement to the police was therefore admissible only if she appeared at trial and Sheppard had the opportunity to cross-examine her.

Neither happened. Consequently, the court's admission of evidence of the accusation violated Sheppard's right to confront her as a witness.

[¶87] The judgment of conviction entered against Sheppard should be set aside because of this constitutional deprivation. Respectfully, I dissent.

---

Justin W. Leary, Esq. (orally), Leary & DeTroy, Auburn, for appellant Ramel L. Sheppard

Neil E. McLean Jr., District Attorney, and Katherine E. Bozeman, Dep. Dist. Atty. (orally), Prosecutorial District III, Lewiston, for appellee State of Maine

Androscoggin County Unified Criminal Docket docket number CR-2020-1119
For Clerk Reference Only